MEYER MITTLEMAN AND PAULA MITTLEMAN, PETITIONERS *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 858–68.   Filed April 26, 1971.

*Herbert L. Zuckerman*, for the petitioners.
*Leo A. Burgoyne*, for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency of $11,-907.56 in the petitioner's 1963 Federal income tax. The issue for decision is whether the petitioner realized a gain, which is taxable as ordinary income, as a result of the termination of a contract by which he was to sell certain stock.

FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Meyer Mittleman and Paula Mittleman, are husband and wife, who maintained their residence in Teaneck, N.J., at the time of filing their petition in this case. They filed their joint 1963 Federal income tax return with the district director of internal revenue, Newark, N.J. Mr. Mittleman will be referred to as the petitioner.

Prior to 1948, the petitioner, Abe Gottlieb, and others engaged in the business of manufacturing optical frames. To conduct such business, certain corporations (the corporations) were formed, of which the petitioner, Mr. Gottlieb, and two others were the sole shareholders.

In 1948, the petitioner, Mr. Gottlieb, and the two other shareholders entered into a shareholders' agreement to restrict the sale of stock of the corporations. Under the terms of such agreement, in the event that one of the shareholders wished to sell his stock, it was necessary that he first offer such stock to the corporation, then to the remaining shareholders. Under the agreement, the purchase price of any stock sold was to be the book value of such stock computed in accordance with certain adjustments delineated therein.

Prior to 1962, the other shareholders sold their interests in the corporations, and on January 1 of such year, the petitioner and Mr.

Gottlieb each owned 50 percent of the stock of each of the corporations. On May 7, 1962, the petitioner entered into an agreement (May agreement) with Mr. Gottlieb whereby the petitioner was to purchase Mr. Gottlieb's stock in the corporations. Such agreement called for a purchase price of $210,000 to be paid $60,000 at the time of the execution of the agreement, and the balance to be paid by the execution of 17 promissory notes which became due seriatim, the final one in November 1963. As collateral, the entire stock of the corporations was to be placed in the hands of an escrow agent. Such stock was to be delivered to the petitioner upon payment of the entire amount of the purchase price. Pending such payment, the entire stock of the corporations was subject to be sold by Mr. Gottlieb in the event of default by the petitioner. Allan Glassman and Lester Mittleman, the petitioner's son, who were not parties to the shareholders' agreement, were made parties to the May agreement solely for the purpose of guaranteeing the petitioner's performance. Paragraph 6 of such agreement provided:

Al Glassman and Lester Mittleman do hereby acknowledge that Gottlieb enters into this contract in reliance upon their joint and several guarantees, as evidenced on the notes executed simultaneously herewith. To further induce Gottlieb to sell to Meyer and accept the notes in part payment thereof, they have acknowledged that benefits will flow to them under employment contracts between them and the Corporations herein involved, and that they have executed, or are about to execute, an option to purchase some or all of the stock herewith sold by Gottlieb to Meyer.

The agreement was signed by the petitioner and Mr. Gottlieb on the right side of the page as parties thereto; it was also signed by Mr. Glassman and Lester Mittleman, but their signatures appeared on the left side of the page below those of the parties.

Also, on May 7, 1962, a Memorandum of Agreement (memorandum) was signed by the petitioner, Mr. Glassman, and Lester Mittleman. The memorandum recited that Mr. Gottlieb was selling his stock in the corporations and that Mr. Glassman and Lester Mittleman were purchasing such stock with the assistance of the petitioner. Mr. Gottlieb was not a party to the memorandum. The purchase price of one 25-percent interest was $105,000. By the terms of the memorandum, each of the parties was to pay one-third of the downpayment due to Mr. Gottlieb under the May agreement and one-third of the amount due under each of the notes. Upon completion of the payments to Mr. Gottlieb, Mr. Glassman and Lester Mittleman were each to pay back to the petitioner any amounts paid by him toward the purchase of the stock; and upon completion of such payments to the petitioner, each was to have an option to purchase 8⅓ percent of the petitioner's half interest in the corporations. The payments on the notes by Mr.

Glassman and Lester Mittleman were to come from their earnings from the corporations. Neither Mr. Glassman or Lester Mittleman were to become stockholders in the corporations until the entire purchase price had been paid to Mr. Gottlieb.

The memorandum also stated that Mr. Glassman would put up $15,000 in cash at the time of the initial payment to Mr. Gottlieb, an additional $10,000 within 90 days after such initial payment, and an additional $5,000 within 30 days after the termination of the 90-day period. Upon default of such payments, the petitioner was to keep as liquidated damages the initial $15,000 cash payment, and in such event, all agreements between Mr. Glassman and either the petitioner or the corporations concerning either the subject matter of the memorandum or Mr. Glassman's employment by the corporations were terminated. The petitioner was to hold Mr. Glassman harmless from any liability to Mr. Gottlieb. The memorandum further stated that under certain employment contracts with the corporations, Mr. Glassman was to have a salary of $15,000 per annum with additional amounts credited to his account for payment to Mr. Gottlieb. In the event Mr. Glassman left the employment of the corporations after his initial $30,000 cash payment was made but before he had completed payment for 25 percent of the stock, paragraph 3 of the memorandum provided:

If Allan leaves employment voluntarily he is to receive his cash back plus ⅓ of any additional funds set aside as additional earnings to his credit. * * *

Within 4 months after the execution of the memorandum, Mr. Glassman paid $30,000 as his share of the initial payment to Mr. Gottlieb, and by August 29, 1963, Mr. Glassman paid $30,600 as his share of the payments on the promissory notes to Mr. Gottlieb.

Sometime prior to August 27, 1963, Mr. Glassman decided to leave the employ of the corporations, and on that date, the petitioner and Mr. Glassman entered into an agreement (August agreement), which provided in part:

WHEREAS, pursuant to the terms of said [memorandum of] agreement Allan has been purchasing from Meyer a portion of Meyer's stock interest in the various corporations, * * *

WHEREAS, Paragraph 3 of said [memorandum of] agreement grants to Allan the privilege of voluntarily leaving the employ of the various corporations upon condition that he sell to Meyer his full and complete interest in the shares of the various corporations which he had theretofore purchased, at a purchase price set forth in said agreement * * *

WHEREAS, Allan hereby formally gives notice of his voluntary withdrawal from the employ of the various corporations * * *

*         *         *         *         *         *         *

Now, THEREFORE, * * * it is agreed as follows:

1. Allan hereby sells to Meyer his full right, title and interest in the shares of the various corporations, and Meyer hereby agrees to purchase the same,

for a total consideration of Forty Thousand Seven Hundred Eighty-Three ($40,783.00) Dollars, * * *

Such agreement also provided that Mr. and Mrs. Glassman were released from any obligations under the May agreement with Mr. Gottlieb and that they would be saved harmless from any liability under such agreement. After the August agreement with Mr. Glassman, the petitioner and Lester Mittleman completed payment of the notes to Mr. Gottlieb.

In his statutory notice of deficiency, the respondent determined that as a result of the operation of paragraph 3 of the memorandum on the occasion of Mr. Glassman's voluntary withdrawal from the employ of the corporations, the petitioner realized a gain in 1963 in the amount of $19,817, taxable to him as ordinary income.

## OPINION

We must decide whether the petitioner realized a gain in 1963, and if so, whether such gain is taxable as ordinary income.

The petitioner's primary contention is that the substance of the 1962 agreements was that Mr. Gottlieb sold two 25-percent interests, one to Lester Mittleman and the other to Mr. Glassman, in such year, and that in 1963, Mr. Glassman sold his 25-percent interest to the petitioner at a fair price in an unrelated, arm's-length transaction. Thus, the petitioner argues, there was no taxable event to him in either year arising out of the transactions.

On the other hand, the respondent contends that under both the form and the substance of the agreements, Mr. Gottlieb sold his 50-percent interest in the corporations to the petitioner, and the petitioner entered into an agreement to sell two 25-percent interests in the corporations, one to Mr. Glassman, the other to Lester Mittleman. The respondent further contends that the memorandum under which the petitioner was to sell the 25-percent interest to Mr. Glassman was at all times executory; that Mr. Glassman's failure to complete the purchase called for by the memorandum resulted in a forfeiture by him of $19,817 and a realization of gain in such amount by the petitioner in 1963; and that such gain represents liquidated damages, taxable to the petitioner in such year as ordinary income. *Harold S. Smith*, 50 T.C. 273 (1968), affirmed per curiam 418 F. 2d 573 (C.A. 9, 1969) ; *Ralph A. Boatman*, 32 T.C. 1188 (1959).

The respondent argues that the petitioner is bound by the terms of the agreements and that he may not by parol evidence attempt to prove that the agreements among the parties were other than appears in such agreements. He relies upon the decision of the Third Circuit in *Commissioner* v. *Danielson*, 378 F. 2d 771 (C.A. 3, 1967), reversing

and remanding with directions 44 T.C. 549 (1965); certiorari denied 389 U.S. 858 (1967), in which the court held that in tax litigation, the Commissioner of Internal Revenue may rely upon the terms of an agreement and that the parties to it may not attempt to show a different agreement in the absence of proof which would enable them to have the agreement set aside or modified. Since the case before us arose in the Third Circuit, we are required to follow the *Danielson* decision for purposes of this case, irrespective of what may be our views in cases arising in other circuits. *Jack E. Golsen*, 54 T.C. 742 (1970). However, even though we declined to apply the *Danielson* rule in *J. Leonard Schmitz*, 51 T.C. 306 (1968), we reiterated our prior position that strong proof is required to establish that the substance of an agreement is different from its form. *Ullman v. Commissioner*, 264 F. 2d 305 (C.A. 2, 1959), affirming 29 T.C. 129 (1957). In the case before us, there has been a failure to establish by strong proof that the substance of the agreements was different from their terms. In fact, we see no significant conflict between the substance and the form of the agreements.

The May agreement plainly purported to be a sale by Mr. Gottlieb to the petitioner. The petitioner was everywhere referred to in such agreement as the purchaser. His liability was to be primary. All of the rights and duties created by such agreement flowed between Mr. Gottlieb and the petitioner. The petitioner agreed to buy the stock. He also agreed to place his own stock in escrow along with the stock being purchased from Mr. Gottlieb. The bargained-for shares were to be endorsed in blank and transferred to an escrow agent and held as security. On completion of the payment of the purchase price, the escrow agent was to convey such shares to the petitioner or to any one whom the petitioner might direct. Thus, upon payment of the last note due, the petitioner was to have complete power of disposition over the entire stock of the corporations. Also, in the event of default in payment, Mr. Gottlieb could declare the entire sum due, cause all or any part of such stock to be sold, and any excess proceeds of such sale were to go only to the petitioner. Only the petitioner and Mr. Gottlieb signed the instrument as parties thereto.

On the other hand, the May agreement refers nowhere to Lester Mittleman or to Mr. Glassman as "purchaser." To the contrary, in such agreement, Lester Mittleman and Mr. Glassman acknowledged that Mr. Gottlieb entered into the May agreement in reliance upon their joint and several guarantees, as evidenced by certain promissory notes. They also acknowledged that they were going to enter certain employment contracts, and that they either *had entered, or would in the future enter, an option* to buy *some or all* of the stock being sold by Mr. Gottlieb to the petitioner. These acknowledgements were de-

scribed in the May agreement as inducements to Mr. Gottlieb to sell to the petitioner. Neither Lester Mittleman nor Mr. Glassman were required to contribute any collateral under the agreement, and they had no right to any excess proceeds from a sale on default. They were liable for any deficiency arising out of such sale, but such liability is consistent with their responsibility as guarantors. Finally, the signatures of Lester Mittleman and Mr. Glassman appeared on the lower left side of the last page of the agreement, apart from the signatures of Mr. Gottlieb and the petitioner, apparently indicating that they were merely approving of the contract as guarantors. Thus, the May agreement was clearly cast in the form of a sale to the petitioner.

Moreover, the provisions of the memorandum were consistent with a purchase of Mr. Gottlieb's stock by the petitioner. The memorandum was an agreement between the petitioner, Lester Mittleman, and Mr. Glassman; Mr. Gottlieb was not a party thereto. Although it recited that Mr. Gottlieb was selling his stock in the corporations and that Mr. Glassman and Lester Mittleman were purchasing such stock, it did not state to whom Mr. Gottlieb was selling or from whom Mr. Glassman and Lester Mittleman were purchasing the stock. It appears that the rights and duties created by the memorandum flowed between the petitioner, Lester Mittleman, and Mr. Glassman, and that any benefit Mr. Gottlieb would receive under the memorandum was incidental. With respect to payment for his stock, Mr. Gottlieb already had the promises of the petitioner as primary obligor and of Lester Mittleman and Mr. Glassman as guarantors on the promissory notes executed pursuant to the May agreement. By the terms of the memorandum, the petitioner agreed to sell the stock to Mr. Glassman and Lester Mittleman, and they agreed to make the payments for such stock. On satisfactory completion of the payments for the stock acquired from Mr. Gottlieb, they had an option to purchase additional stock from the petitioner.

The August agreement contains no provision inconsistent with our conclusions with respect to the May agreement and the memorandum. Mr. Gottlieb was not a party to the August agreement. It recited that Mr. Glassman had been purchasing a portion of the petitioner's stock in the corporations, that Mr. Glassman was voluntarily leaving the employ of the corporations, and that paragraph 3 of the memorandum controlled the rights of the parties in such event. Although the August agreement was written in terms of the petitioner purchasing the interest of Mr. Glassman, the amount paid to him was approximately equal to the amount to which he was entitled under paragraph 3 of the memorandum. In general, it appears that the August agreement merely reflected an agreement under which Mr. Glassman severed his asso-

ciation with the corporations and under which the petitioner and Mr. Glassman agreed to terminate their rights under the memorandum.

At trial, the petitioner offered the testimony of Mr. Gottlieb, Lester Mittleman, and himself in an attempt to prove that in substance the transactions constituted a sale from Mr. Gottlieb to Mr. Glassman and from Mr. Glassman to the petitioner.

Mr. Gottlieb testified that he wanted to sell his stock for a higher price than he would have received in a sale pursuant to the shareholders' agreement. He also testified that in his opinion the petitioner could not have run the business without him, that the petitioner was a production man, and that he encouraged Mr. Glassman, who, like himself, was an outside man, to enter the business. Mr. Gottlieb further testified that he was interested in selling his interest to Mr. Glassman and Lester Mittleman, but that he was advised to bring the petitioner into the transaction to insure payment. However, nowhere did Mr. Gottlieb state that he actually sold any stock to Mr. Glassman. The witness testified that he did not care to whom the stock was sold, but that he wanted a guarantee of payment, and that he was relying on the petitioner's money and Mr. Glassman's sales ability to provide such guarantee. Moreover, although Mr. Gottlieb was required to sell his stock in accordance with the shareholders' agreement—if he sold it— he was not required to sell it, and he could have continued to hold it until offered a satisfactory price. Thus, there is nothing inconsistent between Mr. Gottlieb's stated objectives and the contracts as written. Nor did the testimony of the petitioner or of Lester Mittleman contain any evidence indicating an agreement different from that set forth in the May agreement and memorandum.

In summary, we find that the May agreement, the memorandum, and the August agreement provided for the petitioner to purchase the stock of Mr. Gottlieb and to sell it to Mr. Glassman and Lester Mittleman. Clearly, the evidence offered by the petitioner falls far short of constituting strong proof that their true agreement was other than that set forth in such written agreements. *Ullman* v. *Commissioner*, *supra*.

The petitioner denies that he realized any gain as a result of Mr. Glassman's withdrawal from the arrangement. However, when in 1963, Mr. Glassman left the employ of the corporations, he had paid $60,600 toward the purchase of stock which was to cost $105,000; only $40,783 was returned to him. The petitioner offered no satisfactory evidence to support his contention that the amount returned to Mr. Glassman represented the fair market value of his interest at that time. As far as we can determine, the amount of $19,817 remained in the hands of Mr. Gottlieb as partial payment of the petitioner's obligation under the

May agreement. Thus, while the evidence of record shows that the ultimate recipient of such sum was Mr. Gottlieb, the ultimate benefit was to the petitioner whose personal obligation to Mr. Gottlieb was discharged to the extent thereof.

The petitioner argues alternatively that if the memorandum is considered a contract of sale between the petitioner and Mr. Glassman, the sale thereunder was complete in 1962 when the petitioner received money or its equivalent for a 25-percent stock interest from Mr. Glassman. Any gain, the petitioner further argues, arising from such sale was gain from the sale of a capital asset and was realized in 1962, a year not before us.

The memorandum specified that Mr. Glassman was to pay a total of $105,000 for a 25-percent interest in the corporations. Until he paid the full amount, he was not to be a stockholder in the corporations. The powers given to him by the memorandum with respect to such stock were provided in order to expand his involvement in the business. There is no evidence that title and possession of the stock were to be his before he had paid in full for his entire interest. To the contrary, the petitioner could not convey any of the stock until it was fully paid for in accordance with the May agreement, and Mr. Glassman had no right to the conveyance of the stock until that event. Also, while Mr. Glassman was able to make an initial payment of $30,000, there is no evidence that he was in a financial position to obligate himself to pay the balance of $75,000, except as provided in the memorandum. The memorandum provided that certain amounts were to be credited to his account by the corporations for the purpose of payment for the stock in issue. Compare *John B. Atkins et al.*, 9 B.T.A. 140 (1927), affd. 36 F. 2d 611 (C.A.D.C. 1929). Thus, the memorandum constituted an executory agreement to sell the stock— not a sale of such stock in 1962. Compare *Pacific Coast Music Jobbers, Inc.*, 55 T.C. 866 (1971).

Next, the petitioner contends that if he realized any gain in 1963, such gain is taxable as a long-term capital gain, and in support of such position, he relies upon our decision in *Alvin B. Lowe*, 44 T.C. 363 (1965). In that case, we found that a sale had taken place and that in a later year, there was an adjustment of the purchase price. We held that under such circumstances, the gain resulting from the adjustment of the purchase price should be taxable as a capital gain.

In our opinion, this case is distinguishable from *Lowe*. Here, no sale took place; there was merely a contract by the petitioner to sell stock to Mr. Glassman. The gain realized by the petitioner in 1963 resulted from the operation of paragraph 3 of the memorandum. Under that provision, if Mr. Glassman did not remain with the cor-

porations until he completed paying for his interest in the stock, only a portion of the payments made by him were to be returned to him. In effect, the portion not returned to Mr. Glassman constituted liquidated damages payable as a result of his failure to complete the purchase of stock under the memorandum. On a number of occasions, we have held that such gain does not result from the sale or exchange of a capital asset and therefore must be treated as ordinary income. *Harold S. Smith*, 50 T.C. 273 (1968), affirmed per curiam 418 F. 2d 573 (C.A. 9, 1969); *Ralph A. Boatman*, 32 T.C. 1188 (1959); *A. M. Johnson*, 32 B.T.A. 156 (1935).

We hold that in 1963 the petitioner realized $19,817 as liquidated damages under an executory contract to sell certain stock, and that such amount is taxable as ordinary income. Accordingly,

*Decision will be entered for the respondent.*