Pumi-Blok Company, et al. [1] v. Commissioner. Pumi-Blok Co. v. Commissioner
Docket Nos. 637-68, 638-68, 639-68.
United States Tax Court
T.C. Memo 1972-48; 1972 Tax Ct. Memo LEXIS 203; 31 T.C.M. (CCH) 197; T.C.M. (RIA) 72048; February 24, 1972, Filed John W. Nelson, Suite 507 United California Bank Bldg., 200 Pine Ave., Long Beach, Calif., for the petitioners. Melvern Stein, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax as follows: Dkt. No.
Petitioners
Year Ending
Deficiency
637-68
Pumi-Blok Company
Mar. 31, 1964
$ 3,913.36
Mar. 31, 1965
18,908.31
638-68
Peter G. and Mary M. Muth
Dec. 31, 1964
4,198.00
Dec. 31, 1965
5,226.00
639-68
Arvid T. and Clara Johnson
Dec. 31, 1964
4,370.00
Dec. 31, 1965
5,285.00 The *204 issues for decision are: (1) whether Pumi-Blok Company was entitled to deductions in its taxable years ending March 31, 1964, and March 31, 1965, in the amounts of $7,527.20 and $39,062.02, as bad debts, or alternatively as losses, and (2) whether certain payments made by Pumi-Blok Company in 1964 and 1965 in the amounts of $17,000 and $25,480, respectively, to a partnership composed of Arvid T. Johnson and Peter G. Muth constituted dividends. Findings of Fact The parties have stipulated certain facts, which, together with the attached exhibits, are incorporated herein by this reference. Petitioner in Docket No. 637-68 is Pumi-Blok Company. During the years in issue it was a California corporation. It filed its Federal corporate income tax returns for the taxable years ending March 31, 1964, and March 31, 1965, with the district director of internal revenue at Los Angeles, California. At the time its petition was filed herein Pumi-Blok Company's principal place of business was at Stanton, California. Petitioners in Docket No. 638-68 are Peter G. and Mary M. Muth. They are husband and wife. The Muths filed joint Federal income tax returns for the calendar years 1964 and 1965 *205 with the district 198 director of internal revenue at Los Angeles, California, and resided in Santa Ana, California, at the time of the filing of their petition herein. Petitioners in Docket No. 639-68 are the Estate of Arvid T. Johnson and Clara Johnson, Arvid's wife. Arvid T. and Clara Johnson filed joint Federal income tax returns for the calendar years 1964 and 1965 also with the district director of internal revenue at Los Angeles, California, and resided in Anaheim, California, at the time of the filing of their petition herein. Arvid T. Johnson died on November 11, 1970, after the filing of the petition, and the Bank of America National Trust and Savings Association, Santa Ana, has been duly appointed executor of his will, and has been substituted as a party petitioner in Docket No. 639-68 herein. Since 1946, Pumi-Blok Company ("Pumi-Blok" or the "corporation") has been in the business of manufacturing lightweight building blocks at its plant in Stantion, California, situated in Orange County. During the 1950's the corporation was one of several manufacturers of building blocks in the Southern California area which dominated the market. The building blocks manufactured *206 by Pumi-Blok were marketed through a sister corporation, Orco Block Company, which was not involved in the transactions here in issue. Pumi-Blok first operated as a partnership. In 1948 it was incorporated, and at all times here relevant the stock of the corporation was owned equally and wholly by Arvid T. Johnson ("Johnson"), Peter G. Muth ("Muth") and their respective wives. Also at all pertinent times both Mr. and Mrs. Muth and Mr. and Mrs. Johnson were the directors of the corporation. Besides their interests in Pumi-Blok, Arvid T. Johnson and Peter G. Muth were also partners engaged in the business of owning and renting real property in Southern California. Each owned a 50 percent interest in the partnership which was known as Johnson and Muth (hereinafter the "Johnson and Muth partnership" or the "partnership"). The partnership did not have an office of its own, and Pumi-Blok's bookkeeper kept the books of the partnership along with Muth who did some of the work at his home. In addition, at least part of the land upon which the corporation conducted its business of building block manufacture was leased from the partnership. During the years in issue the Johnson and Muth partnership *207 was not in the business of financing business ventures. For approximately the first one and a half years of its operation Pumi-Blok used pumice as the base material in the composition of its building blocks. Pumice is a soft, volcanic material with "slow acting" properties. Building blocks made from this substance were prone to crack approximately six months after being used in wall construction, and for this reason the building block industry found pumice to be an unsuitable base material. Accordingly, from the late 1940's until around 1966, Pumi-Blok and other members of the industry constructed building blocks from natural cinder. Sometime around 1955 building blocks composed of expanded shale aggregate were brought into market by two other building block manufacturers. Expanded shale was made from raw shale, a natural substance. The raw shale was extracted from the ground, "pre-sized" in its dry state, and then expanded to the desired size for production of building blocks by heating in a rotary kiln at approximately 2,100 degrees. Rocklite Company ("Rocklite") and Ridgelite Company (Ridgelite") had developed sources of supply of shale and were actively involved in the production *208 of expanded shale. Building blocks produced from expanded shale were of lower weight but greater strength and insulation value than those composed of natural cinder. Because of these features such expanded shale building blocks enjoyed a superior market position. Pumi-Blok attempted to purchase expanded shale from both Rocklite and Ridgelite, but neither company would sell the product to the corporation. Rocklite was itself involved in the production of building blocks in competition with Pumi-Blok. Ridgelite was wholly owned by another building block manufacturer, Chamco Building Block Company, and sold the product solely to its parent company. Because of the competitive superiority of expanded shale building blocks, Pumi-Blok's position in the market place began to deteriorate. Accordingly, in addition to its attempts to purchase expanded shale from Rocklite and Ridgelite, the corporation also made other efforts to obtain expanded shale aggregate. At one point Pumi-Blok agreed to make a prepayment of $25,000 for expanded shale aggregate 199 to Paul Splein ("Splein") from whom the corporation purchased natural cinder. Such payment was intended to promote Splein's formation *209 of a new company to produce expanded shale, but the new company never came into being. In 1956 Pumi-Blok was contacted by a Mr. Chaffee ("Chaffee"), the president of O'Kelly-Eccles Company, another of the prominant building block manufacturers in the Southern California area. Chaffee had located a deposit of natural shale and interested both Pumi-Blok and another building block company, Elliott Precision Block Company, in the formation of a new corporation to manufacture expanded shale aggregate. The minutes of the board of directors meeting of Pumi-Blok on September 14, 1956, reported the following proposals in respect of the expanded shale production proposed by Chaffee: It was moved by Peter Muth and seconded by Clara Johnson that a new corporation be formed which would be known under the name - Southern California Lightweight Aggregate Co. - and that the Pumi Blok Co. would purchase one fourth interest at a cost of $25,000.00 as a stock purchase, and [the] Johnson & Muth [partnership] would put up an additional $62,500.00 maximum when needed, which would be guaranteed by Pumi Blok Co. This sum, $62,500.00 would be loaned to the Southern California Lightweight Aggregate *210 Co. Since the Pumi Blok Co. cannot raise this $62,500.00, the Johnson and Muth combine would do so, and the Pumi-Blok Co. at it's [sic] earliest opportunity will take over the loans of the Johnson & Muth [partnership]. Sometime in 1956 or 1957, Southern California Lightweight Aggregate Company was incorporated by Pumi-Blok, O'Kelly-Eccles Company and Elliott Precision Block Company. The new corporation's name was subsequently changed to Shale-Lite Corporation, and the name "Shale-Lite" will be used hereinafter. The purpose of forming Shale-Lite was to acquire a source of supply of expanded shale aggregate for Shale-Lite's incorporators which would afford them a competitive base material for building block manufacture. The three incorporating Shale-Lite stockholders did not anticipate any immediate profit from the venture; their principal purpose was merely to obtain a source of inexpensive expanded shale aggregate for themselves. Initially, 85-90 percent of the aggregate produced by Shale-Lite was sold to its three stockholders, as explained hereinafter. Nonetheless, it was contemplated that sales of expanded shale would be made to other purchasers if the venture ever proved *211 successful. On September 10, 1957, Pumi-Blok acquired 2,500 shares of $10 par value Shale-Lite stock, representing paid-in capital of $25,000. The record does not adequately disclose what percentage of Shale-Lite's capital stock was purchased by Pumi-Blok at the time. In the initial years of Shale-Lite's existence, it was necessary for its shareholders to make several advances to it for the purchase of land and equipment and in respect of certain construction costs. During this period Shale-Lite was unable to obtain financing from any other source. It was anticipated that the advances from its shareholders would be repaid by Shale-Lite out of its earnings from sales of expanded shale aggregate to the three shareholder-block manufacturers. Pumi-Blok itself, however, experienced difficulties in maintaining adequate working capital. Accordingly, a plan was devised whereby the Johnson and Muth partnership advanced funds to Shale-Lite on behalf of Pumi-Blok and received in return Pumi-Blok notes evidencing the corporation's indebtedness to the partnership for the advances made on the corporation's behalf. Pumi-Blok itself received Shale-Lite notes in respect of the advances. In effect, *212 the partnership lent the funds to the corporation which in turn made advances to Shale-Lite also in the form of loans, as explained hereinafter. Johnson and Muth maintained at least two accounts at the Bank of America from which it made disbursements. One of these accounts was a general account in the name of the partnership. The other was a special account set up specifically to make advances to Shale-Lite in the name of Pumi-Blok and was referred to in the partnership's books and records as the Bank of America Construction Account. The bank requested that this special account be set up independently of the general partnership account to prevent amounts lent by the bank to the Johnson and Muth partnership for the Shale-Lite advances from being commingled with general partnership funds. The partnership's disbursement journal disclosed that in 1957 advances to Shale-Lite were made in the amount of $33,500 200 from the Bank of America Construction Account. In respect of these advances, Pumi-Blok issued its own notes to the Johnson and Muth partnership on May 8, 1957, and April 15, 1957, in the respective amounts of $20,000 and $13,500. In addition to the above advances of $33,500, *213 the Johnson and Muth partnership advanced $12,500 to Shale-Lite on December 10, 1957, from its general partnership account at the Bank of America. Also on December 10, 1957, Pumi-Blok issued its note to the partnership in the amount of $12,500 in respect of this advance, and the Pumi-Blok loan account on Shale-Lite's books and records was credited in the same amount on December 30, 1957. On January 22, 1958, Johnson and Muth advanced $43,000 to Shale-Lite from its general partnership account and an additional $1,000 from its Bank of America Construction Account. In respect of these two advances, Pumi-Blok issued two notes to the partnership in the amounts of $43,000 and $1,000, respectively, on January 27, 1958. The obligation in the amount of $43,000 was subsequently discharged. In addition to the above notes issued by Pumi-Blok to the partnership in respect of advances made to Shale-Lite, the corporation also issued a note to the Johnson and Muth partnership in the amount of $40,000 on December 15, 1959, for advances made to Shale-Lite. The contributions which its stockholders designated as loans to Shale-Lite were made in direct proportion to their shareholdings. Shale-Lite's *214 account on its general ledger entitled "Loans From Incorporators" disclosed that as of October 31, 1959, total advances made by Pumi-Blok amounted to $111,767.52. In respect of these advances Pumi-Blok's account on its general journal and ledger entitled "Notes Receivable - Shale-Lite Corp." similarly showed a debit balance as of June 30, 1960, of $111,767.52. Although the record establishes that Shale-Lite notes in respect of the advances made by Pumi-Blok were extant during the years in issue, no formal notes evidencing the indebtedness on Shale-Lite's part were introduced into evidence, and the record does not disclose the terms of such notes. Shale-Lite's general ledger also disclosed that interest was accrued on what was designated as indebtedness owing to its shareholders in respect of the advances described above, and that payments were periodically made in respect of such interest until January 31, 1960. After January 31, 1960, no payments were made on the accrued interest because of certain financial reverses experienced by Shale-Lite, as explaine hereinafter. On July 31, 1960, Pumi-Blok acquired an additional 1,952 shares of $10 par value Shale-Lite stock, in respect *215 of which the Shale-Lite account "Loans From Incorporators" was debited in the amount of $19,520; also, the Pumi-Blok account designated "Notes Receivable - Shale-Lite Corp." was credited in the amount of $19,520. As of July 31, 1960, the outstanding shares of Shale-Lite stock were owned as follows: Pumi-Blok Company
4,452 shares
32.02%
Elliott Precision Block Company
4,452 shares
32.02%
O'Kelly-Eccles Company 5,000 shares
35.96%
13,904 shares
100%
As a consequence of the above transaction involving the purchase of the additional 1,952 shares of Shale-Lite stock by Pumi-Blok, Pumi-Blok's "Notes Receivable - Shale-Lite Corp." account revealed a debit balance of $92,247.52 as of March 31, 1961, and the Shale-Lite account in respect of "Loans From Incorporators" disclosed a credit balance also of $92,247.52. Also, as of March 31, 1961, Pumi-Blok's account for "Investments - Shale-Lite Corp." reflected a debit balance of $44,520. The total of the amount carried as an investment on Pumi-Blok's books and records ($44,520) and the amount carried as loans to Shale-Lite ($92,247.52) was $136,767.52, and this amount represented the total unrepaid advances made *216 by or on behalf of the corporation to Shale-Lite during the years in issue. Pumi-Blok's account entitled "Notes Payable - Johnson & Muth" disclosed a credit balance of $99,857.93 as of May 31, 1961, which included the five amounts aggregating $87,000 referred to hereinabove as the indebtedness incurred by Pumi-Blok in respect of advances made to Shale-Lite by the Johnson and Muth partnership on behalf of Pumi-Blok. These amounts (as found hereinabove) were as follows: May 8, 1957
$20,000
September 15, 1957
13,500
December 10, 1957
12,500
January 27, 1958
1,000
December 15, 1959 40,000
$87,000 201 Shale-Lite started to produce expanded shale aggregate around April 1, 1958. As explained above, 85 to 90 percent of the expanded shale aggregate was sold to its three shareholders, Pumi-Blok, Elliott Precision Block Company and O'Kelly-Eccles Company. The remaining 10-15 percent was sold to two or three small manufacturers of building blocks. Sometime in early 1960 and about the time that the Shale-Lite operation began to show some success, Shale-Lite experienced certain difficulties in respect of its production of expanded shale aggregate. The raw shale *217 from which Shale-Lite manufactured its products revealed deposits of lime. Such so-called "hot lime" caused "pop-outs" or fissures in the building blocks. The presence of "hot lime" in the raw shale meant that Shale-Lite could not produce expanded shale aggregate that was suitable for manufacturing building blocks. Over a period of time not disclosed by the record, Shale-Lite made several attempts to remedy the "hot lime" problem but was unable to find an adequate solution. Sometime in early 1961 Pumi-Blok was informed by the Bank of America, which also made loans to the corporation, that in view of Pumi-Blok's financial situation the bank could not lend Pumi-Blok additional funds. The bank took a "dim view" of the Shale-Lite venture and suggested that Pumi-Blok's credit position would be improved if the corporation transfered certain assets it held in Shale-Lite to the Johnson and Muth partnership. In this respect the minutes of the board of directors meeting of Pumi-Blok for April 18, 1961, reported as follows: Under new business it was moved and seconded to transfer enough Shale-Lite notes to Johnson and Muth to cover the following notes owed by Pumi-Blok Co. to Johnson and *218 Muth: Note dated May 8, 1957
$20,000.00
Note dated Sept. 15, 1957
13,500.00
Note dated Dec. 10, 1957
12,500.00
Note dated Jan. 27, 1958
1,000.00
Note dated Dec. 15, 1959 40,000.00
Total
$87,000.00 This will retire the loan by Johnson and Muth to Pumi Blok Co. for the Shale-Lite Investment. The Pumi-Blok Co. also guarantees and agrees to make these notes good to Johnson and Muth if for some unknown reason Shale-Lite Corp. does not fulfill their obligations. It was moved and seconded by Pete Muth and Clara Johnson to notify the Shale-Lite Corp. to transfer stock certificate No. 4 and Stock certificate No. 5 covering 4452 shares of stock to Arvid T. Johnson and Peter G. Muth as tenents in common. This stock will secure the Shale-Lite notes transferred to Johnson and Muth to cover loan. Although the April 18, 1961 minutes reported that the transfer of the 4,452 shares of Shale-Lite stock to the Johnson and Muth partnership was meant only to "secure" the Shale-Lite notes to be transfered at the same time to the partnership, and that "enough Shale-Lite notes" were to be transferred to discharge the $87,000 in Pumi-Blok notes held by the partnership, the *219 exchange was entered on Pumi-Blok's general journal and ledger on May 31, 1961, as follows: Acct.
No.
Charges
Description
Credit
2060
$87,000
Stock Certificate #4 for
$44,520
2500 shares Shalelite
Stock, stock certificate
#5 for 1952 shares Shale-
lite Stock was trans-
ferred to Johnson and
Muth to cover notes
owed by Pumi Blok Co.
to Johnson & Muth
To transfer enough
42,480
Shalelite notes to John-
son & Muth to retire the
balance of notes owed
by Pumi Blok to John-
son & Muth As a result of the transfer Pumi-Blok's account for "Notes Receivable - Shale-Lite Corp." was credited in the amount of $42,480 and thereby reduced from a balance of $92,247.52 to $49,767.52 as of May 31, 1961. Also, an entry to the corporation's "Investments - Shale-Lite Corp." account was made crediting that account in the amount of $44,520 in respect of the stock transfer, thereby leaving a remaining balance of zero as of May 31, 1961. In respect of the five notes issued by Pumi-Blok to the partnership, Pumi-Blok's account "Notes Payable - Johnson & Muth" was debited in the total amount of $87,000. *220 The Johnson and Muth partnership's general ledger reflected the transfer of the Shale-Lite stock and notes in cancellation of the Pumi-Blok notes as follows: Acct.
1961
Description
No.
Charges
Credit
5/31
Investment - Shale-Lite
Corp.
125
$44,520
Notes Receivable -
Pumi Blok Co.
120
$44,520
To credit 4452 shares
of Stock Certificate No.
7 received from Pumi
Blok Co. to apply on
note in the sum of
$44,520.00 202 Acct.
1961
Description
No.
Charges
Credit
5/31
Notes Receivable -
Shale-Lite Corp.
120
$42,480
Notes Receivable -
Pumi Blok Co.
120
$42,480
Shale-Lite notes re-
ceived from Pumi Blok
Co. to retire note owed
by Pumi Blok Co. As of May 31, 1961, the partnership's general ledger account for "Notes Receivable" disclosed a debit balance of $42,480 in Shale-Lite notes, and its account for "Investment - Shale-Lite Corp." stated a debit balance of $44,520. Because of the difficulties Shale-Lite was experiencing in respect of the presence of the "hot lime" in its shale deposit, the Shale-Lite stock and notes transferred to the Johnson *221 and Muth partnership by Pumi-Blok were worth less than their face value. At the time of the transfer in 1961, the stock had a minimal value, and the notes were worth only approximately 15 cents on the dollar. The notes, however, were guaranteed by Pumi-Blok as mentioned in the minutes of the corporation's board of directors meeting of April 18, 1961. Ultimately, as a result of its difficulties with the "hot lime" deposits, Shale-Lite ceased active operations in September, 1962. Accordingly, pursuant to the guarantee of the Shale-Lite notes the partnership transferred the Shale-Lite notes back to Pumi-Blok. In this respect the minutes of Pumi-Blok's board of directors meeting of February 19, 1963, reported as follows: In our minutes of April, 1961, the notes were sold in affect to Johnson and Muth in order that the financial statement of Pumi-Blok would have a better financial appearance so that the company could borrow money from the bank. At that time the Pumi-Blok Co. guaranteed these notes and agreed to make them good if the Shale-Lite Corp. could not fulfill their obligation. At this time, it is definitely known that the Shale-Lite Corp. have ceased active business in September *222 1962, and has no chance of continuing or re-entering the lightweight aggregate field. Consequently it is now necessary according to the guarantee, to return the notes to the Pumi-Blok Co. since it has been well established that the Shale-Lite Corp's finances are in bad shape. Since there is a possibility of a sale of the physical assets, not necessarily a probability, but a possibility, that it would be well to take action on these notes at this time for the corporate year end. The minutes did not refer to the Shale-Lite stock transferred by Pumi-Blok to the Johnson and Muth partnership simultaneously with the notes as explained hereinabove. To reflect the transfer of the Shale-Lite notes from the partnership back to Pumi-Blok, Pumi-Blok's account for "Notes Receivable -shale-Lite Corp." was debited in the amount of $42,480 by a journal entry dated February 28, 1963. Moreover, in respect of the guarantee a new subaccount under "Notes Payable - Others", entitled "Johnson & Muth (Shale-Lite)", was set up on Pumi-Blok's general journal and ledger on February 28, 1963, reflecting a credit balance of $42,480. Pumi-Blok's general journal and ledger also disclosed the following entry *223 on February 28, 1963: Gen-
Gen-
Acct.
eral
Description
Acct.
eral
No.
Ledger Day
of Entry
No.
Ledger
1201
$42,480 28
To reverse J E 214
2060
$42,480
These shares were
not turned over to
Johnson & Muth to
retire note "JE 214" referred to the page in the general journal and ledger where the transfer of the Shale-Lite stock to the partnership was recorded. The record does not adequately explain the nature of this entry inasmuch as the shares transferred on "J E 214" were treated as having a value of $44,520, and the Shale-Lite stock transferred by Pumi-Blok to the Johnson and Muth partnership was never returned to the corporation, as explained hereinafter. After Shale-Lite ceased its operations in 1962 several efforts were made to "sell the corporation". Advertisements were placed through the Expanded Shale Institute and at one point Riverside Cement Company Shale-Lite. But the option was not Shale-Lite offered for sale the Johnson exercised and the $12,500 was forfeited at the end of the year. During this period when Shale-Lite offered for sale the Johnson and Muth partnership made certain advances to Shale-Lite *224 on its own for which no corresponding entries were made on Pumi-Blok's general journal and ledger as was the case with the prior advances totaling $87,000 here in issue. The last such advance was in the amount of $30,500, and was apparently made in order to allow Shale-Lite to pay off its creditors and thereby stave off insolvency proceedings. 203 This advance of $30,500 was secured by a first trust deed on certain land owned by Shale-Lite. On December 2, 1964, Pacific Vegetable Oil Corporation entered into an option agreeement with Arvid T. Johnson and Peter G. Muth, individually, and Elliott Precision Block Company and O'Kelly-Eccles Company for the sale of all the stock and notes of Shale-Lite. The option agreement provided in part as follows: RECITALS: A. Elliott Precision Block Company owns 4452 shares, O'Kelly-Eccles Company owns 5000 shares, Arvid T. Johnson and Peter G. Muth, a tenants in common, own 4452 shares of the $10 par value common stock of Shale-Lite Corporation, a California corporation, hereinafter referred to as "Shale-Lite", (hereinafter collectively referred to as the "shares") constituting all of the outstanding shares of said corporation, all of *225 which shares are held in escrow pursuant to the conditions of the Permit authorizing their issuance. B. Sellers own notes of Shale-Lite (hereinafter referred to as the "notes") in the amount set opposite their respective names in Exhibit "A" hereto. * * * AGREEMENT: * * * 4. Purchase Price: The total purchase price which Buyer agrees to pay in the event of exercise of the option and which Sellers agree to accept is $185,265.80, $10 for each of said shares ($139,040) and $46,225.80 for the notes. * * * 7. Warranties and Representations of Sellers: Sellers warrant, represent and agree to and with Buyer as follows: (a) Sellers have authority to enter and grant the option herein given and each of them, respectively, have full, complete and absolute title to the shares and the notes. (b) The title of Sellers to said shares and notes is, and will be, at the time of delivery to Buyer, free and clear of any liens, charges, or encumbrances, except the aforesaid escrow conditions, and said 13,904 shares constiute all of the outstanding capital stock of Shale-Lite, and that by sale of said shares and notes hereunder, Buyer will receive good and absolute title thereto, free from any *226 liens, charges or encumbrances thereon; * * * (i) All accrued interest on any amount owed by Shale-Lite to Sellers shall be forgiven, discharged and released, by Sellers, as soon after exercise of the option, as possible, but in any event, prior to the closing date, and it is agreed that neither Shale-Lite nor Buyer shall have any further responsibility therefor after said date. * * * PROMISSORY NOTES OWNED BY STOCKHOLDERS *13 (Exclusive of Current Liabilities Dis- closed on Exhibit "B")
O'Kelley-Eccles Company[sic]
$103,539.39
Arvid T. Johnson and Peter G. Muth
92,247.52
Elliott Precision Block Company 92,209.69 $287,996.60 The option agreement also included an interim balance sheet for Shale-Lite as of October 31, 1964, which disclosed total assets in the amount of $309,601.04, and notes payable to shareholders of $287,996.60. At the time the option agreement was entered into with Pacific Vegetable Oil Corporation, Johnson and Muth called two errors in the agreement to the attention of an attorney involved in the transaction. One such error was in respect of the recital in Exhibit "A" to the option agreement that Johnson and Muth, rather than *227 Pumi-Blok, held $92,247.52 in Shale-Lite notes. The other error related to their understanding that the Shale-Lite stock which the partnership had originally received in 1961 was to be transferred back to Pumi-Blok prior to the sale of Shale-Lite stock and notes. They were advised in effect not to jeopardize the consummation of the sale by pressing the matter, to allow the sale to go through, and then to allocate the amounts received by them between the partnership and Pumi-Blok according to their understanding. In fact, the partnership had transferred all the Shale-Lite notes it had previously received back to Pumi-Blok prior to the execution of the option agreement, but it had not returned the Shale-Lite stock. The sale of the Shale-Lite stock and notes was concluded on March 29, 1965, and the partnership received $59,321.50, or 32.02 percent of the purchase price, in accordance with the provisions of the option agreement of December 2, 1964. Pursuant to the allocation of the purchase price in paragraph four of the option agreement $44,520 was in respect of the 4,452 shares of Shale-Lite stock still held by the partnership. The remaining $14,801.50 was in respect of the portion *228 of Shale-Lite's 204 outstanding notes which were described in the option agreement as held by the Johnson and Muth partnership. The partnership retained the $44,520 paid for the stock held by it. The $14,801.50 in respect of the notes was turned over to Pumi-Blok. Prior to the purchase of Shale-Lite stock and notes by Pacific Vegetable Oil Corporation and on December 31, 1964, and January 26, 1965, Pumi-Blok made payments of $17,000 and $25,480, respectively, to the Johnson and Muth partnership in connection with the corporation's guarantee of the Shale-Lite notes originally transferred to the partnership in 1961. These amounts ($17,000 and $25,480) taken together with the $44,520 received by the partnership from the sale of the Shale-Lite stock to Pacific Vegetable Oil Corporation totaled $87,000, the same amount as the Pumi-Blok indebtedness to the partnership which was cancelled in exchange for the Shale-Lite stock and notes. A net total of $136,767.52 was originally contributed to the Shale-Lite venture by Pumi-Blok or on its behalf by the Johnson and Muth partnership (as found hereinabove). Of this amount $44,520 was in respect of the Shale-Lite stock transferred to the *229 Johnson and Muth partnership on May 31, 1961, for which indebtedness in that amount owing by Pumi-Blok to the partnership was discharged. In respect to the remaining $92,247.52, which was carried on the corporation's books and records as "Notes Receivable - Shale-Lite Corp.", $14,801.50 was discharged by the payment, described above, which the partnership made to the corporation as a consequence of the sale of the Shale-Lite stock and notes to Pacific Vegetable Oil Corporation. The remaining amount ($77,446.02) was reflected in bad debt write-offs on Pumi-Blok's general journal and ledger for which it claimed deductions on its corporate tax returns in the years and amounts as follows: Bad-Debt
Year Ending
Deduction
March 31, 1963
$30,856.80
March 31, 1964
7,527.20
March 31, 1965 39,062.02
Total
$77,446.02
In his deficiency notice to Pumi-Blok the Commissioner determined that the corporation was not entitled to the bad debt deductions claimed in the amounts of $7,527.20 and $39,062.02 in its taxable years ending March 31, 1964, and March 31, 1965, respectively. In his deficiency notices to the individual petitioners herein the Commissioner determined *230 that the payments of $17,000 and $25,480 made by Pumi-Blok to the Johnson and Muth partnership in 1964 and 1965, respectively, represented "dividend income". The Commissioner therefore included in each partner's income for 1964 his distributive share (1/2) of the $17,000. The Commissioner likewise included in each partner's income for 1965 their distributive share of the $25,480. The Commissioner also determined that the Johnson and Muth partnership incurred a net capital loss in 1965 from the sale of the Shale-Lite notes and stock to the Pacific Vegetable Oil Corporation, as follows: Sale of notes and stock - basis
$87,000.00
Amount received 59,321.50
Capital loss
$27,678.50
One-half to each partner
13,839.25
It is further determined that your distributive share of said capital loss was $13,839.25. Your net capital loss deduction and adjustment to income, as above, is computed as follows:
Capital loss allowable (limitation)
$ 1,000.00
Capital loss per return None
Decrease in income
$ 1,000.00
Opinion RAUM, Judge: The issues for decision are: (1) whether Pumi-Blok was entitled to deductions either as bad debts or as losses in respect of portions *231 of the $87,000 advanced to Shale-Lite, [2] and (2) whether the payments made by Pumi-Blok to the Johnson and Muth partnership in 1964 and 1965 in the amounts of $17,000 and $25,480, respectively, constituted dividends to the partners. We deal first with the deduction issue in respect of the corporate petitioner. 1. The deduction issue. (a) We consider preliminarily the Commissioner's contention that Pumi-Blok did not own the Shale-Lite notes, in respect of which the deductions in issue were claimed, at the time of the sale to Pacific Vegetable Oil Corporation. In this connection the Commissioner has directed our attention to the 205 December 2, 1964, option agreement *232 with Pacific Vegetable Oil Corporation to which both Johnson and Muth were parties. The agreement contained recitals and warranties that the Johnson and Muth partnership held "full, complete and absolute title" to both the Shale-Lite stock and notes. The Commissioner, relying upon Commissioner v. Danielson, 378 F. 2d 771, 775 (C.A. 3), certiorari denied, 389 U.S. 858, argues that Pumi-Blok should not be allowed to contradict this language in the option agreement. The Danielson case represents the rule followed in the Third Circuit. However, a less extreme rule has been approved elsewhere to the effect that if a taxpayer presents "strong proof", he may take a position contrary to the language in the pertinent agreement. Ullman v. Commissioner, 264 F. 2d 305, 308 (C.A. 2), affirming 29 T.C. 129. This Court has adhered to the "strong proof" rule, J. Leonard Schmitz, 51 T.C. 306, 315-318, on appeal (C.A. 9, Mar. 18, 1969), which had also been approved by the Ninth Circuit in Schulz v. Commissioner, 294 F. 2d 52, 55, *233 affirming 34 T.C. 235. And while we have indicated in Meyer Mittleman, 56 T.C. 171, 175, that we will follow Danielson in cases arising in the Third Circuit under the compulsion of Jack E. Golsen, 54 T.C. 742, affirmed 445 F. 2d 985 (C.A. 10), certiorari denied, - U.S. -, we are nevertheless free to apply the "strong proof" rule elsewhere. The present case arises in the Ninth Circuit which has explicitly approved the "strong proof" rule of the Ullman case, and we hold that it is applicable here rather than the Danielson rule. Moreover, the Danielson case involved the allocation of a purchase price upon the sale of a business between a covenant not to compete and other assets, and there is substantial doubt as to the extent to which that case may be regarded as controlling in other types of situations. See $ Edith M. Gerlach, 55 T.C. 156, 168-169. While it is true that the option agreement contained not only recitals that the notes were held by the Johnson and Muth partnership but also warranties to that effect, the record calls for a contrary finding. The evidence before us convincingly establishes that these provisions *234 of the option agreement were in error, that Muth called the error to the attention of an attorney who participated in the transaction, but was advised to let the agreement go through as it was rather than to jeopardize the consummation of the sale, and then to allocate the proceeds of the sale between the partnership and Pumi-Blok. Furthermore, the books and records of both the partnership and corporation reflect that the only Shale-Lite notes transferred by Pumi-Blok to the Johnson and Muth partnership were in the face amount of $42,480, and that these notes were transferred on May 31, 1961. Moreover, these same books and records show that such $42,480 in Shale-Lite notes were transferred by the partnership back to the corporation on February 28, 1963, prior to the December 2, 1964 option agreement. Even more significant is that as a consequence of the sale of the Shale-Lite stock and notes to Pacific Vegetable Oil Corporation, the partnership paid $14,801.50 to Pumi-Blok in respect of the notes. In these circumstances, we think the petitioners have presented "strong proof" that the December 2, 1964, option agreement wrongly represented that the Shale-Lite notes were held by the *235 partnership and not Pumi-Blok, and have so found in our Findings of Fact. (b) As we view the record Pumi-Blok participated in the formation of Shale-Lite in order to obtain a necessary source of supply of expanded shale aggregate which it required to retain its competitive position in the market. Unable itself to advance all the funds needed by Shale-Lite for starting-up costs, a plan was devised whereby the Johnson and Muth partnership made net advances in the aggregate amount of $87,000 to Shale-Lite on behalf of Pumi-Blok. The alleged indebtedness for these advances was carried on Shale-Lite's general ledger as owing to Pumi-Blok, and notes were issued in respect thereof. Pumi-Blok, in turn, issued its own notes to the partnership in the aggregate amount of $87,000 and thereby became indebted to the partnership in that amount. Although Johnson and Muth were individually interested in both the corporation and the partnership, Pumi-Blok and the Johnson and Muth partnership functioned as separate business entities in distinct fields prior to the inception of the Shale-Lite venture. We see no reason on the record before us to disregard these separate entities. Cf. Sam Siegel, 45 T.C. 566, 575-577. *236 The books and records of the corporation, the partnership and Shale-Lite 206 clearly reflect that the advances in question were regarded as coming from Pumi-Blok which had a direct interest in the success of the venture. The minutes of Pumi-Blok's September 14, 1956, board of directors meeting make it clear that such advances as were made by the partnership in the first instance were to be assumed at the "earliest opportunity" by Pumi-Blok. And, in fact, as indicated above, Pumi-Blok issued its own notes to the partnership and assumed the risks associated with the Shale-Lite venture by itself taking the Shale-Lite notes. In this respect it is also significant that the only other advances made to Shale-Lite during this period were similarly from its other two shareholders, which were also building block manufacturers. In the circumstances, we think the characterization of the advances as "loans" or "capital contributions" is not in itself controling for the purposes of this case. We agree with the Commissioner that although the advances in question were cast in the form of "loans", they nonetheless represented equitable interests in or "capital contributions" to Shale-Lite on *237 behalf of its shareholders, rather than loans which could form the basis for a bad debt deduction.[3] Accordingly, the amounts in question are not deductible as "bad debts" under section 166 of the 1954 Code. But the matter does not end there, for the losses which Pumi-Blok sustained may nevertheless be deductible in full under section 165, provided that they are not subject to the limitations upon capital losses made applicable by section 165(f). However, it is well settled in this latter respect that the tax treatment of losses (capital versus ordinary) arising out of the ownership of an interest such as the one which Pumi-Blok had in Shale-Lite depends on the purpose for which the interest was acquired and held by the taxpayer. Booth Newspapers, Inc. v. United States, 303 F. 2d 916, 921 (Ct. Cl.); Schlumberger Technology Corp. v. United States, - F. 2d -, - (C.A. 5); Electrical Fittings Corporation, 33 T.C. 1026; 1031; Tulane Hardwood Lumber Co., 24 T.C. 1146, 1149-1150; Western Wine & Liquor Co., 18 T.C. 1090, 1098-1099. See Waterman, Largen & Co. v. United States, 419 F. 2d 845, 852-854 *238 (Ct. Cl.). The rule was stated in Booth Newspapers, Inc. v. United States, 303 F. 2d 916, 921 (Ct. Cl) as follows: The cases * * * stand for the proposition that, if securities are purchased by a taxpayer as an integral and necessary act in the conduct of his business, and continue to be so held until the time of their sale, any loss incurred as a result thereof may be fully deducted from gross income as a business expense or ordinary loss. If, on the other hand, an 207investment purpose be found to have motivated the purchase or holding of the securities, any loss realized upon their ultimate disposition must be treated in accord with the capital asset provisions of the Code. *239 In the case before us the record establishes that unless Pumi-Blok was able to secure a source of expanded shale aggregate its competitive position in the market place could not have been sustained. Virtually no "investment" motive existed on Pumi-Blok's part either in the formation of Shale-Lite or in respect of the advances made to it. [4] Rather Pumi-Blok advanced the $87,000 to Shale-Lite in order to obtain a source of expanded shale aggregate, which represented a "vital" raw material in the conduct of its business of manufacturing building blocks. Cf. Booth Newspapers, Inc. v. United States, supra, 303 F. 2d at 921, 922 (Ct. Cl.); Electrical Fittings Corporation, supra, 33 T.C. at 1031. *240 Moreover, we think Pumi-Blok's purpose in respect of the Shale-Lite venture did not change prior to the time of the sale of the Shale-Lite stock and notes to Pacific Vegetable Oil Corporation. Cf. Missisquoi Corporation, 37 T.C. 791, 798; Gulftex Drug Co., 29 T.C. 118, 121, affirmed per curiam 261 F. 2d 238 (C.A. 5). The record shows that after Shale-Lite ceased active operations in 1962 because of the difficulties it encountered with "hot lime" deposits, several efforts were made to sell Shale-Lite, including granting a one-year option to a prospective purchaser. In other words, as soon as Pumi-Blok and the other shareholders of Shale-Lite could no longer achieve their orignal purpose of manufacturing suitable expanded shale aggregate diligent efforts were made to dispose of Shale-Lite. And ultimately the Shale-Lite stock and notes were sold to Pacific Vegetable Oil Corporation in 1965. There was no intervening period when the stock and notes were held for investment purposes. Cf. Booth Newspapers, Inc. v. United States, supra, 303 F. 2d at 922 (Ct. Cl.). We therefore think that the losses incurred by the corporation upon *241 the sale of the notes in question may be fully deducted from gross income as ordinary losses. Section 165, I.R.C. 1954; Booth Newspapers, Inc. v. United States, supra, 303 F. 2d at 921-922. 2. Dividend issue. We consider next whether the payments of $17,000 and $25,480 made by Pumi-Blok to the Johnson and Muth partnership in 1964 and 1965, respectively, constituted dividends to Johnson and Muth. Much of what we have said above in connection with the bad debt issue applies here also. It is clear that from the time of the initial negotiations in respect of Shale-Lite, Pumi-Blok intended to assume all the risks involved in the venture. The corporate minutes of September 14, 1956, indicate that Pumi-Blok would at the "earliest opportunity * * * take over the loans of the Johnson & Muth". Indeed the Shale-Lite notes were issued to Pumi-Blok in respect of the $87,000 in advances, and Pumi-Blok, in turn, issued its own notes in the amount of $87,000 to the partnership upon which the corporation became indebted. This indebtedness on Pumi-Blok's part to the partnership was cancelled in 1961 in exchange for the Shale-Lite stock and notes and the corporation's *242 guarantee "to make these notes good" should Shale-Lite fail to do so. When Shale-Lite ceased active operations, and it became clear that Shale-Lite could not pay off the notes, Pumi-Blok took the Shale-Lite notes back from the partnership and made the payments here in issue pursuant to its guarantee. The payments, therefore, were not dividends but rather partial repayment of the corporation's initial indebtedness of $87,000 to the partnership, which inhered in the corporation's guarantee of the Shale-Lite notes. Decision will be entered under Rule 50 in Docket No. 637-68. Decisions will be entered for the petitioners in Docket Nos. 638-68 and 639-68. 208 Footnotes
1. Cases of the following petitioners are consolidated herewith: Peter G. Muth and Mary M. Muth, docket No. 638-68; and Estate of Arvid T. Johnson, Deceased, Bank of America National Trust and Savings Association, Santa Ana, Executor, and Clara Johnson, docket No. 639-68.↩
2. It claimed such deductions in the aggregate amount of $77,446.02 over a three year period in the amounts of $30,856.80, $7,527.20, and $39,062.02 for its fiscal years ending March 31, 1963, 1964, and 1965, respectively. Only the second and third of such years are involved herein; no issue has been raised or presented as to the correct year or years in which such deductions might properly be taken if otherwise allowable, and accordingly our decision herein is not to be read as passing upon any such issue.↩
3. Whether advances to a corporation represent risk capital or loans is, of course, a question of fact. Jewell Ridge Coal Corporation v. Commissioner, 318 F. 2d 695, 698 (CA-4), affirming a Memorandum Opinion of this Court; O.H. Kruse Grain & Milling v. Commissioner, 279 F. 2d 123, 125 (CA-9), affirming a Memorandum Opinion of this Court; Gilbert v. Commissioner, 262 F. 2d 512, 513 (CA-2), certiorari denied 359u.s./ 1002, affirming a Memorandum Opinion of this Court. The mere fact that the advances are carried on the corporation's books and records as loans is not dispositive. Sam Schnitzer, 13 T.C. 43, 60-61, affirmed per curiam 183 F. 2d 70 (CA-9), certiorari denied 340 U.S. 911; Isidor Dobkin, 15 T.C. 31, 33, affirmed per curiam 192 F. 2d 392 (CA-2). There are several factors present in this case which indicate that the advances in question constituted capital contributions. The prospect of repayment depended entirely on the success or failure of the venture inasmuch as the advances were to be repaid by Shale-Lite out of its earnings from sales of the expanded shale aggregate to its three stockholders. See Phil L. Hudson, 31 T.C. 574, 583; Isidor Dobkin, supra, 15 T.C. at 34, affirmed per curiam 192 F. 2d 392 (CA-2); Curry v. United States, 396 F. 2d 630, 634 (CA-5), certiorari denied 393 U.S. 967; Jewell Ridge Coal Corporation v. Commissioner, supra, 318 F. 2d at 699 (CA-4), affirming a Memorandum Opinion of this Court. The funds were required by Shale-lite to purchase assets in the form of land and equipment and also in respect of certain construction costs, all of which were necessary to the inception of the enterprise. See Isidor Dobkin, supra, 5 T.C. at 33, affirmed per curiam 192 F. 2d 392 (CA-2); Charter Wire, Inc. v. United States, 309 F. 2d 878, 880 (CA-7), certiorari denied 372 U.S. 965. Indeed, the record does not disclose the terms of the notes, including whether the notes had a particular maturity date, and to the extent that there is a lack of proof in this respect the petitioners must bear the consequences. Moreover, aside from the advances made by its shareholders Shale-Lite was unable to obtain financing from any other source, and such advances as were made were in direct proportion to established equity holdings. Road Materials, Inc. v. Commissioner, 407 F. 2d 1121, 1125 (CA-4), affirming and remanding a Memorandum Opinion of this Court; Curry v. United States, supra, 396 F. 2d at 634 (CA-5), certiorari denied 393 U.S. 967; Isidor Dobkin, supra, 15 T.C. at 44, affirmed per curiam 192 F. 2d 392↩ (CA-2).
4. To be sure, there is some suggestion in the evidence that the parties anticipated that Shale-Lite at some future date might make sales to the general public if the venture proved successful. But that prospect was of such distinctly secondary significance that the only real motive for Pumi-Blok's purchase of stock in and "loans" to Shale-Lite was to obtain a source of needed material with which to manufacture its building blocks. There was no "investment" motive of substance in connection with the venture.↩