**Arthur A. PROULX and B. J. Cushman Proulx**

v.

**The UNITED STATES.**

**No. 381–74.**

United States Court of Claims.

Feb. 21, 1979.

Mel Cahan, Chicago, Ill., for plaintiffs; Arnold H. Landis, Chicago, Ill., Atty. of record; Lurie & Cahan, Chicago, Ill., of counsel.

S. Martin Teel, Jr., Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser and Donald H. Olson, Washington, D. C., of counsel.

Before NICHOLS, BENNETT and SMITH, Judges.

OPINION

PER CURIAM:

This case comes before the court on plaintiffs' exceptions to the recommended decision of Trial Judge Lloyd Fletcher, filed November 30, 1977, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, with one minor deletion by the court,[*] it hereby affirms and adopts the recommended decision, as modified and herein-

[*] Although the court adopted the trial judge's separate findings of fact, which are set forth in his opinion, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

after set forth as the basis for its judgment in this case. It is, therefore, concluded as a matter of law that plaintiffs are not entitled to recover and their petition is dismissed.

## OPINION OF TRIAL JUDGE

FLETCHER, Trial Judge:

In this income tax case, the court is confronted with the complex principles of tax law which have been developed by the myriad cases dealing with the proper tax treatment to be accorded the proceeds of the sale of a business where the seller thereof agrees not to compete with the purchaser. Frequently, that problem is inextricably intertwined, as it is in this case, with the further question of whether the form given to the sale can ever govern the substance of the transaction.[1]

Unfortunately, it takes no more than a cursory examination of the case law to disclose that the decisions in this area are in bewildering disarray. This is true whether one examines the decisions of the several circuit courts of appeals, the district courts of the United States Tax Court.[2] Small wonder, then, that the author of the most recent and comprehensive study of the problem describes the area in masterful understatement as "this unruly subject." *See* Beghe, footnote 2 at p. 588.

That this should be so is itself somewhat perplexing, for the basic underlying rules are quite simple and enjoy virtual unanimity among the courts. What a covenantor receives for his promise not to compete is taxable to him as ordinary income.

*Beal's Estate v. Commissioner*, 82 F.2d 268 (2d Cir. 1936). What the covenantee pays for that promise of non-competition may be amortized by him and deducted over the life of the covenant, provided the covenant has an ascertainable life. *Commissioner v. Gazette Telegraph Co.*, 209 F.2d 926 (10th Cir. 1954). For a comprehensive discussion of these principles, see also *Schmitz v. Commissioner*, 51 T.C. 306 (1968), *aff'd sub nom. Throndson v. Commissioner*, 457 F.2d 1022 (9th Cir. 1972). These basic rules are succinctly summarized by the court in *Ullman v. Commissioner*, 264 F.2d 305 (2d Cir. 1959) at 307–08:

It is well established that an amount a purchaser pays to a seller for a covenant not to compete in connection with a sale of a business is ordinary income to the covenantor and an amortizable item for the covenantee unless the covenant is so closely related to a sale of good will that it fails to have any independent significance apart from merely assuring the effective transfer of that good will. [Citing cases.]

Bearing these underlying principles in mind, it is now appropriate to outline the essential facts in the case at hand.

The taxpayers, Mr. and Mrs. Arthur A. Proulx, moved from Chicago to Florida in 1958 primarily because of Mr. Proulx's failing health. At that time he was in his seventies and she in her sixties. Shortly after their move, they purchased a motel and restaurant business fronting on the Atlantic Ocean in the Sebastian area just south of Melbourne, Florida and obtained an oral commitment from their sellers that

1. This form-substance maxim has been referred to by Judge Learned Hand as an "anodyne(s) for the pains of reasoning." *Commissioner v. Sansome*, 60 F.2d 931, 933 (2d Cir., 1932), *cert. denied* 287 U.S. 667, 53 S.Ct. 291, 77 L.Ed. 575 (1932). The statement has been attributed to the late Roscoe Pound that such "maxims" should really be called "minims" since they convey a minimum of information with a maximum of pretense.

2. See, for example, the numerous studies of the covenant not to compete contained in many legal periodicals and taxation journals. Beghe, *Income Tax Treatment of Covenants Not to Compete, Consulting Agreements and Transfers of Goodwill*, 30 Tax. Lawyer 587 (1977) (hereinafter cited as "Beghe"); Madison, *Tax Treatment of Covenants Not to Compete*, 24 U. of Miami L.Rev. (1969); Messere and Davison, *Goodwill or Covenants Not to Compete?*, 54 Taxes 161 (1976); Barnet, *Covenants Not to Compete*, 18 NYU Inst. on Fed.Tax. 861 (1960); Taylor, *Covenants Not to Compete*, 12 NYU Inst. on Fed.Tax. 1047 (1954); Note: *Tax Treatment of Covenants Not to Compete: A Problem of Purchase Price Allocation*, 67 Yale L.Jour. 1261 (1958).

the latter would not open or operate a competing business in the area.

The trade name of their newly acquired business was the Sea Dunes Motel and Restaurant. Because of the dilapidated condition of the property, extensive renovation and improvements to both the motel units and the restaurant were necessary.

Originally, the Proulxs employed others to operate and manage the business, but after a few years they decided this arrangement was unsatisfactory. Whereupon, Mrs. Proulx personally took over all management duties [3] and thereafter ran both the motel and restaurant business during the entire period of their ownership. She built the restaurant into a noted lobster house and gradually developed the entire operation into a pleasant and popular resort. Much of the clientele were "return guests" who came from various locations in the eastern part of the country.

In addition to the oceanfront property on which was built the motel, restaurant, and their personal residence, the Proulxs owned unimproved acreage on the western side of Highway A1A. They had constructed a canal on this acreage which gave it access to the Indian River, and their plans were ultimately to develop the property into residential homesites.

Mr. Proulx's health continued to deteriorate, and his doctor advised him to take no part in any business activities. He further suggested to Mrs. Proulx that her work in the management of the business was not agreeing with her. This development appears to have set the Proulxs into considering a sale of the business and its properties. Initial sales efforts by a prominent real estate agency were unsuccessful.

However, in February 1969, a local real estate broker, John Cannon, put the Proulxs in touch with Lloyd Miller and William Rose who were looking around for a motel and restaurant business in the Melbourne area. Initial negotiations seemed promising, and the Proulxs retained Frank Clark, Esq., a local criminal lawyer, to represent them.

A few days later, Cannon, on behalf of Miller and Rose, presented an offer to purchase the entire Sea Dunes property on the oceanfront side of Highway A1A for $400,000. That offer was rejected by the Proulxs whose asking price was $500,000.

Subsequently, Cannon submitted another offer on behalf of Miller and Rose to purchase the property, both east and west of Highway A1A for $465,000, with a $10,000 earnest money deposit. That offer contained a covenant not to compete and specifically allocated $50,000 of the purchase price thereto. Mrs. Proulx told Cannon that they were satisfied with the increased price and would accept such an offer, but that the contract would have to be sent over to Clark, their attorney, for his examination. The Proulxs then took the offer to Clark and left it for him to study.

Upon examining the details of the $465,000 offer, Clark found certain points unacceptable to him. He considered inadequate the earnest money deposit of $10,000, and the subordination and release clauses were unsatisfactory. Clark reviewed the covenant not to compete and while he did not understand the reason for it since he knew the Proulxs definitely intended to retire, he had no objection to its inclusion in the proposed contract. Clark also reviewed the allocation of the purchase price made to the land, buildings, personal property, liquor license, and the covenant not to compete. Clark did not know why that allocation was made, but, nevertheless, had no objection to its inclusion, Clark had no acquaintance with the tax laws, and it seems never to have occurred to him that these provisions of the proposed contract might have some tax significance to both the buyers and the sellers.

Clark told Cannon about his earnest money deposit objection and informed the attorney representing Miller and Rose, Robert T.

---

3. Due to his continuing ill health, Mr. Proulx was unable to contribute in any substantial way to the day-by-day operation of the business.

Westman, Esq.,[4] of his objections to the subordination and release clauses. Westman indicated that he would redraft the subject clauses in accordance with Clark's suggestions and would send those drafts to Clark. Cannon indicated that he would take care of getting an increase in the earnest money deposit. It was then agreed that the final contract would incorporate the redrafts of the subject clauses and would be typed in final draft by Clark's office. This was done. Approximately two weeks elapsed from the time that Clark received that offer from his clients for his review and the time that Clark received the redrafts from Westman and what was to become the March 17, 1969 signing. Clark was satisfied with Westman's redrafts with respect to the subordination and release clauses, and had no other legal objections to the proposed contract.

On the morning of March 17, 1969, Mrs. Proulx received a telephone call from Cannon who asked if she and her husband could be at the National Bank of Melbourne at 11:00 a. m. to sign the sales contract. After receiving assurances that all interested parties, including her attorney, would be present, Mrs. Proulx told Cannon they would be there.

Attending that meeting with the Proulxs were Cannon, Westman, Miller, Rose, and Howard Hebert, the president of the bank. Clark was not there. Despite Cannon's assurances to the contrary, apparently Clark had never been notified of the meeting. When the Proulxs arrived at the bank and noticed that Clark was not present, Mrs. Proulx became anxious and concerned. She telephoned Clark's office and was informed by Clark's secretary that he was in Titusville on a criminal matter. Mrs. Proulx returned and indicated to those present that since Clark would be unable to attend, they preferred not to continue without him. From the ensuing discussion, the Proulxs became apprehensive that the deal might fall through entirely and they went ahead and signed the contract that day. Mrs.

Proulx stated that "the only reason" they did so was because they wanted to sell the Sea Dunes, and they thought Miller and Rose were able to buy it, having the money and the capabilities to operate the business.

No one present at that meeting used any physical force, pressure, threats, or abusive language designed to induce plaintiffs to sign the sales contract. In fact, it is undisputed that they were free to leave the meeting at any time they desired without signing the sales contract.

The Contract for Sale and Purchase which plaintiffs signed on March 17, 1969, provided for the sale of the Sea Dunes Motel and Restaurant business, including all real and personal property described therein to Sebastian Sea Dunes, Inc. (a Florida corporation organized and closely held by Miller and Rose) for a total price of $465,000. That contract contained a covenant not to compete and specifically allocated $50,000 of the purchase price to that covenant. It provided as follows:

3. Arthur A. Proulx and Babe June Proulx, his wife, jointly and severally covenant not to compete with the buyer by operating, managing, or owning, either directly or indirectly any motel, restaurant cocktail lounge or similar facility in Brevard County or Indian River County within five (5) years from the date of closing of this transaction.

The contract also provided for the transfer of the trade name "Sea Dunes" to the purchaser of the business, as follows:

4. The sellers relinquish all right, title and interest that they may have in and to that certain trade name "Sea Dunes Motel" or "The Sea Dunes," and agree not use [sic] said name incident to any trade or business in which they may hereafter engage for a period of five (5) years from the date of closing.

No specific allocation of the purchase price was made to the trade name "Sea Dunes Motel" or the "Sea Dunes."

4. Unlike Clark, Mr. Westman was not only an experienced real estate attorney but was also well-versed in the tax laws, particularly as they applied to real estate transactions.

The sales transaction was closed on September 25, 1969. As part of that transaction, the Proulxs took back a purchase money mortgage in the amount of $365,000. Sebastian Sea Dunes, Inc. fell into default thereunder almost immediately. Since the Proulxs had no desire to retake possession of the mortgaged properties, they were very lenient in granting time extensions and mortgage modifications. Nonetheless, the buyer remained in serious default, and finally the Proulxs foreclosed on the Sea Dunes and, following a receivership, returned to operate the business for a period of several months. They were successful in reselling the property in 1971 and have not owned it since that time.

Sebastian Sea Dunes amortized the covenant not to compete and took deductions in respect thereto on its 1969 and 1970 Federal income tax returns. On their 1969 Federal income tax return, the Proulxs ignored the covenant and reported their entire gain on the sale as capital gain. However, on audit by the Internal Revenue Service, the agent treated $50,000 of the sales proceeds as allocable to the covenant not to compete and hence taxable to plaintiffs as ordinary income. Plaintiffs contend that under the circumstances present here, this action was completely unrealistic and improper.

The case has been before the court on cross-motions by the parties for summary judgment. By Order dated October 15, 1976, (as supplemented by Order dated October 21, 1976) the court denied the cross-motions for summary judgment and remanded the case to the trial judge with instructions to hold a trial and determine "whether or not the taxpayers were induced to sign the contract of sale through fraud, duress, threats, mistake, or undue influence and whether or not the covenant not to compete is void under Florida law and, if so, whether that is material to a decision of this court, and for such other findings and proceedings as the trial judge deems proper."

In thus directing the trial judge to determine whether fraud, duress, threats, mistake, or undue influence had induced the signing of the contract with its covenant not to compete, the court is obviously reasserting its adherence to what has come to be called "the *Danielson* rule." *Commissioner v. Danielson,* 378 F.2d 771 (3d Cir. 1967), *cert. denied,* 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967). There a majority of the Third Circuit Court of Appeals, sitting *en banc,* described its approach to the question of the proper tax treatment of a covenant not to compete in the following language at 378 F.2d 775:

. . . We begin by noting that the determination as to whether a covenant not to compete was actually executed is important, taxwise, both to the buyer and the seller. A tax challenge aside, the amount a buyer pays a seller for such a covenant, entered into in connection with a sale of a business, is ordinary income to the covenantor and an amortizable item for the covenantee. *Ullman v. Commissioner of Internal Revenue,* 264 F.2d 305 (2d Cir. 1959). Indeed, the presumed tax consequences of the transaction may, as here, help to determine the total amount a purchaser is willing to pay for such a purchase. Therefore, to permit a party to an agreement fixing an explicit amount for the covenant not to compete to attack that provision for tax purposes, absent proof of the type which would negate it in an action between the parties, would be in effect to grant, at the instance of a party, a unilateral reformation of the contract with a resulting unjust enrichment. If allowed, such an attack would encourage parties unjustifiably to risk litigation after consummation of a transaction in order to avoid the tax consequences of their agreements. And to go behind the agreement at the behest of a party may also permit a party to an admittedly valid agreement to use the tax laws to obtain relief from an unfavorable agreement.

Of vital importance, such attacks would nullify the reasonably predictable tax consequences of the agreement to the other party thereto. Here the buyer would be forced to defend the agreement in order to amortize the amount allocated

to the covenant. If unsuccessful, the buyer would lose a tax advantage it had paid the selling-taxpayers to acquire. In the future buyers would be unwilling to pay sellers for tax savings so unlikely to materialize.

Finally, this type of attack would cause the Commissioner considerable problems in the collection of taxes. The Commissioner would not be able to accept taxpayers' agreements at face value. He would be confronted with the necessity for litigation against both buyer and seller in order to collect taxes properly due. This is so because when the Commissioner tries to collect taxes from one party he may, as here, dispute the economic reality of his agreement. When the Commissioner turns to the other party, there will likely be the arguments that the first party, as here, received consideration for bearing the tax burden resulting from the sale and that the covenants did indeed have economic reality.

█ For these reasons we adopt the following rule of law: a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction *or to show its unenforceability because of mistake, undue influence, fraud, duress, etc.* [Emphasis supplied.]

In a sharp dissent, the Chief Judge of the Circuit (joined by two of his colleagues) disagreed with the majority on the ground that they had disregarded the long line of decisions by the United States Supreme Court to the effect that "in determining tax liability, taxing authorities must look through form to fact and substance."[5] The dissent then goes on to remark at 378 F.2d 780:

> Although citing no authority, the majority asserts that the obligation to ascertain the substance of a transaction

does not apply in this case because here it is one of the parties rather than the Commissioner who seeks to show that the substance of the transaction differed from its form. This proposition does not follow from the cases; in both *Helvering v. F. & R. Lazarus,* supra, and *Helvering v. Tex-Penn Oil Co.,* supra, the victorious taxpayers had attacked the form in which the transactions were cast, and the Commissioner had relied on the formal arrangement.

In a stinging attack on the public policy underlying the majority decision, Chief Judge Staley states at 378 F.2d 782:

> The policy basis of the majority seems to be that allowance of the attack on the consideration allocated to the covenant may cause the promisee to ". . . lose a tax advantage it had paid the selling-taxpayers to acquire." However, as I read this, it opens the door wide for individuals to avoid tax consequences by artifices such as we have in this case. This result is an invitation to tax evasion.

\* \* \* \* \* \*

> The danger of distortion of the tax laws is particularly acute in this area. As noted by the majority, since the "amount allocable to a covenant not to compete is amortizable by the buyer and ordinary income to the seller, *it generally does not matter what amount is allocated.*" (Emphasis added.) The majority would have the Commissioner attack such an allocation only where the Government would suffer a net loss in revenue, apparently disregarding in all other cases the question whether the allocation was an artifice without "[arguable] independent basis in fact or arguable relationship with business reality," the test heretofore applied by the various circuits and the Tax Court and the Supreme Court. The difficult burden of showing fraud, etc. placed upon the parties by the majority virtually

---

5. *Helvering v. Tex-Penn Oil Co.,* 300 U.S. 481, 492–3, 57 S.Ct. 569, 574, 81 L.Ed. 755 (1936). Numerous other Supreme Court decisions are also discussed in the dissenting opinion including the parent case of *Eisner v. Macomber,* 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521 (1919), the landmark decision in *Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935) and *Helvering v. F. & R. Lazarus & Co.,* 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226 (1939).

insures that knowledgeable buyers will engage in questionable and sharp dealing to secure the advantages of such covenants, and the majority's rule will shield their agreements. I cannot condone this invitation given by the majority.

These lengthy quotations (perhaps unduly so) from both majority and minority opinions in the *Danielson* case have been set forth with full recognition that, under our system of *stare decisis*, it is the majority opinion that controls. It has been done here, however, to demonstrate vividly the competing considerations which have produced the disarray in the case law referred to at the outset of this opinion.

For example, the United States Tax Court, in cases arising elsewhere than the Third Circuit, will not follow *Danielson*. *See Schmitz v. Commissioner, supra,* and compare a case arising from the Third Circuit, *Mittleman v. Commissioner,* 56 T.C. 171 (1971), *aff'd per curiam,* 464 F.2d 1393 (3d Cir. 1972). Meanwhile, the various Circuit Courts of Appeals, mostly on appeals from the Tax Court, have been developing their own doctrines in this area.

Three distinct tests have evolved. They have been called the "severability" test, the "economic reality" test, and the "intent" test. *See* Beghe, footnote 2, *supra,* at pp. 590–591.

As noted by Beghe, the "severability" test was the first developed, and it focused on the question of whether the covenant could be segregated and valued independently from other assets transferred, particularly goodwill. *See Michaels v. Commissioner,* 12 T.C. 17 (1949), and *Burke v. Commissioner,* 18 T.C. 77 (1952). This original test now seems to have survived only in the Second Circuit. *See Ullman v. Commissioner,* 264 F.2d 305, (2d Cir. 1959), although the case is also referred to as an example of judicial application of a rule known as the "strong proof" rule which is related to the "economic reality" test.

The general dissatisfaction with the severability test has resulted in the judicial formulation of a new test, commonly called the "economic reality" test. It seems to be the test now preferred by the Tax Court. *See Wager v. Commissioner,* 52 T.C. 416 (1969). The Ninth Circuit was apparently the first circuit court to articulate the doctrine clearly when it observed that to support an allocation "the covenant must have some *independent basis in fact* or some arguable relationship with *business reality* such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." *Schulz v. Commissioner,* 294 F.2d 52, 55 (9th Cir. 1961), *aff'g* 34 T.C. 235 (1960) (Emphasis supplied). *See also, Bennett v. Commissioner,* 450 F.2d 959 (6th Cir. 1971); *Wilson Athletic Goods Mfg. Co. v. Commissioner,* 222 F.2d 355 (7th Cir. 1955); and *Balthrope v. Commissioner,* 356 F.2d 28 (5th Cir. 1966).

One year later, the Ninth Circuit again considered the problem and added yet another element which has become known as the "intent" test. *See Annabelle Candy Co. v. Commissioner,* 314 F.2d 1 (9th Cir. 1962) in which an agreement for a third party covenant did not expressly allocate any portion of the consideration to the covenant. Again rejecting the severability test, the court affirmed the Tax Court's decision disallowing the buyer's deduction, despite substantial evidence of the importance which the bargaining for the covenant had played in the negotiations. The court did this by stating that it was necessary, in addition to satisfying the economic reality test, that the buyer in claiming a deduction in the absence of an express allocation show that the parties *intended* such an allocation. Likewise, the First Circuit has held that the seller who attempts for tax purposes to repudiate an express contractual allocation to a covenant must show that there was no intent to make such an allocation. *Harvey Radio Laboratories, Inc. v. Commissioner,* 470 F.2d 118 (1st Cir. 1972). The court appears to treat the economic reality of the allocation as irrelevant, and thus in this respect approaches the *Danielson* rule. Finally, the Fourth Circuit has adopted an approach to the problem which appears to combine both the economic reality and the intent tests. *General Insurance Agency,*

*Inc. v. Commissioner*, 401 F.2d 324 (4th Cir. 1968).

These disparate approaches to this complex problem leave us, to use a golfing analogy, "in the rough."[6] Fortunately, however, this court has blazed a pathway in this wilderness. On several occasions, it has referred to the rule of *Commissioner v. Danielson, supra*, with approval. A recent example is the case of *Dakan v. United States*, 492 F.2d 1192, 203 Ct.Cl. 655 (1974) where the court stated *per curiam* :

> The trial judge holds that in the absence of mistake, fraud, undue influence, etc., the taxpayer is bound by the allocations he made in the sales agreement, citing *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir. 1967), *cert. denied*, 389 U.S. 858 [88 S.Ct. 94, 19 L.Ed.2d 123] (1967). We have twice recently cited *Danielson* with approval. *Davee v. United States*, 444 F.2d 557, 195 Ct.Cl. 184 (1971); *Eckstein v. United States*, 452 F.2d 1036, 196 Ct.Cl. 644 (1971). *Danielson* involved an allocation in a selling agreement between stock and a covenant not to compete, and it was held or assumed that the assignment of any value to the covenant not to compete was not in accord with economic reality. It was also held or assumed that a polarity in the tax treatment of buyer and seller was required, *i. e.*, one had to be a counterpart of the other. Thus to sustain the seller's position would jeopardize the buyer's enjoyment of the tax treatment it presumably had bargained and paid for. 492 F.2d 1193, 203 Ct.Cl. 657–8.

In addition to the approvals of the *Danielson* case noted above, it is entirely clear that the court has reasserted its adherence to that rule in this very case. While the court's Order of October 15, 1976, remanding this case to the trial judge does not specifically refer to the *Danielson* case, the language used in that Order very clearly

adopts the Third Circuit rule and instructs the trial judge accordingly.

■ Nonetheless, counsel for plaintiffs continues to opt for the economic reality test as exemplified by the Ninth Circuit decisions in *Schulz* and *Annabelle Candy Co., supra*. His position in this regard is easily understandable, for there can be little doubt on this record that the covenant not to compete as included in the plaintiffs' contract for the sale of the Sea Dunes had no significant economic reality. It is entirely clear that the Proulxs entertained no intention whatever to compete with any buyer of the Sea Dunes. For reasons of declining health and advancing age, they intended to retire with no mental reservations whatsoever.

Their intentions in this respect were well known to everyone concerned, including Miller and Rose.[7] Both testified to that effect, although Miller did indicate a general feeling that it was "prudent" to have a covenant not to compete just in case the Proulxs should change their minds. Undoubtedly, it was this realization and knowledge of the Proulxs' intention that accounted for the failure of both sellers and buyers at any time to bargain about, or even to discuss, the proposed covenant. Such failure to negotiate for a covenant has been treated as evidence of lack of intent to allocate any sum thereto. *See General Insurance Agency, Inc. v. Commissioner, supra*. However, where early in the negotiations the buyer specified that he desired the covenant and the amount of the allocation thereto, and the seller never objected, as was true here, it has been held that there was little reason to negotiate and therefore the lack of negotiations was not critical. *See Rudie v. Commissioner*, 49 T.C. 131 (1967) and *Levinson v. Commissioner*, 45 T.C. 380 (1966).

---

**6.** Speaking in another context, Mr. Justice Rehnquist once said of conflicting decisions in the several courts of appeals that they "may be summarized in the language of Macduff: 'Confusion now hath made his masterpiece.'" *Reid v. Immigration and Naturalization Service*, 420 U.S. 619, 628, 95 S.Ct. 1164, 1170, 43 L.Ed.2d 501 (1975).

**7.** In *Schulz* the court treated such knowledge by the buyer as evidence of lack of intent to allocate.

Such discussions of the covenant as occurred here were solely between Miller, Rose, and their attorney, Westman. And even those discussions do not appear to have concerned the merits or substance of the covenant but centered instead on Westman's advice that it had substantial tax advantages to the buyer of commercial property. In contrast, neither the Proulxs, nor their attorney, had the slightest concept of the covenant's tax impact. Not that this fact in any way governs the outcome of this case, for as the Fifth Circuit of Appeals observed in *Balthrope, supra*:

> No one has to arrange his business affairs to satisfy the tax collector's appetite for revenues. But when a taxpayer has failed to arrange his affairs so as to minimize his taxes, he cannot expect the court to do it for him *nunc pro tunc*. 356 F.2d 34.[8]

See, also, *Hamlin's Trust v. Commissioner*, 209 F.2d 761 (10th Cir. 1954) where the court observed at 209 F.2d 765:

> It is reasonably clear that the sellers failed to give consideration to the tax consequences of the provision [a covenant not to compete], but where parties enter into an agreement with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax consequences.

Even though appealing, the difficulty with plaintiffs' argument is at once apparent. While for reasons previously discussed, there is considerable merit in their contention that under the *Schulz* doctrine and its economic reality test the covenant here should be disregarded, they are in effect asking this trial judge to ignore the *Danielson* rule as plainly set forth in the court's order of October 15, 1976. Of course, that invitation must be declined. If the wisdom of the *Danielson* rule is in need of reexamination, that effort is for the Ap-

pellate Division of this court, not for a member of its Trial Division acting under specific instructions as outlined above.

Proceeding, then, to those specific instructions, it will be recalled that the trial judge was first directed to determine whether taxpayers were induced to sign the sales contract with its covenant not to compete through fraud, duress, threats, mistake, or undue influence. Counsel for plaintiffs vigorously asserts that by reason of their advanced ages, poor health, and general sensitivity, plaintiffs were unusually susceptible to "high pressure" tactics, and he alleges that the statements made by Westman and Hebert "in a gruff and discourteous manner" at the meeting where the sales contract was signed amounted in the case of these elderly plaintiffs to duress and undue influence. In this connection, he places great emphasis on the absence of plaintiffs' attorney. While the failure of the real estate agent to notify the attorney of the meeting was clearly inexcusable, there has not been any showing whatever that, even if present, the Proulx' attorney would have advised them not to sign the contract *because it contained a covenant not to compete*, or, indeed, for any other reason. All of the evidence of record is to the contrary and shows clearly that, once his several objections had been taken care of, he was entirely satisfied with all the contract provisions.

There is no doubt that Clark made a mistake in not recognizing the tax implications of the covenant. But, as the cases cited above show, the overlooking of possibly adverse tax consequences is simply no ground for disregarding the contract. *See Hamlin's Trust, supra*. The failure to recognize tax consequences is not the "mistake" of which *Danielson* speaks.

The court makes it clear in the *Danielson* opinion that the "mistake, undue influence,

---

**8.** In this connection, one is also reminded of Judge Learned Hand's famous dictum that "[O]ver and over again courts have said that there is nothing sinister in so arranging one's affairs as to keep taxes as low as possible. Everybody does so, rich or poor; and all do right, for nobody owes any public duty to pay more than the law demands: taxes are enforced exactions, not voluntary contributions. To demand more in the name of morals is mere cant." *Commissioner v. Newman*, 159 F.2d 848. 850 (2d Cir., 1947) (dissenting opinion.)

fraud, duress, etc." to which it refers is only that which in an action between the contracting parties would result in the court setting aside or reforming the contract. No such showing has been made in this case. From all the evidence in this case, it is entirely clear to me that, even if we assume that Sebastian Sea Dunes had proven to be a profitable enterprise, and if we assume further that the Proulxs had decided to compete in the area with a new motel and restaurant, a Florida court would have enforced the covenant and enjoined them from such competition. In short, plaintiffs have failed to prove that they were induced to enter into this sales contract by reason of any fraud, duress, threats, mistake, or undue influence brought to bear upon them by the buyers or their attorney.

This brings us to the final instruction of the court to the trial judge, namely, to determine whether the covenant not to compete was void under Florida law. Clearly, it was not. The applicable state law is Section 542.12 of the Florida Statutes Annotated. That section will only be summarized here. Its main thrust is to void covenants not to compete as being in restraint of trade except, however, where such covenants are reasonable in both time and space restrictions and are accompanied by the sale of the good will of a business.

To plaintiffs, the covenant here involved fails to come within the exception, not because it was unreasonable in its time and space limitations but because the sales contract of which it was a part made no specific mention of the sale or transfer of good will. They argue further that the covenant runs afoul of the Florida statute because of the financial failure of the buyer which eventually resulted in its ceasing to carry on the business.

In my view, these arguments are without merit. It is quite clear that during the years of operation, plaintiffs built a considerable amount of good will into the business known as the Sea Dunes Motel and Restaurant. A majority of their customers were return guests, a fact which itself meets the time-honored definition of good

will as the expectancy that "the old customers will resort to the old place." *Winn-Dixie Montgomery, Inc. v. United States*, 444 F.2d 677, 681 (5th Cir. 1971).

■ Nor is it fatal that the contract and its covenant not to compete make no specific mention of good will. Its transfer is implied. *See*, for example, *Yost v. Patrick*, 245 Ala. 275, 17 So.2d 240 (1944) where, in dealing with a statute similar to Section 542.12, the Supreme Court of Alabama stated:

It is not essential that the contract for the sale of a business expressly include the good will thereof. Covenants [not to compete] designed, in the nature of them, to protect the good will of the business being sold, imply a sale of the good will. [Id. at 244.]

Surely, also, it must be obvious that when plaintiffs agreed to part with all their rights to the tradename "Sea Dunes Motel," they intended to sell the good will which they had carefully nurtured during the years they operated the motel and restaurant business.

There can be little doubt that the foregoing observations delineate the current state of the law in Florida. For example, the Supreme Court of Florida in *West Shore Restaurant Corp. v. Turk*, 101 So.2d 123 (Fla.1958) has applied the statutory exception here involved to uphold a non-competitive covenant given in conjunction with the sale of a restaurant because it was apparent that a transfer of good will accompanied the covenant. *Cf. Orkin Exterminating Co. v. Girardeau*, 301 So.2d 38 (Fla.App.1974) where a covenant not to compete was unreasonable in its area restriction and hence was regarded as offending Section 542.12.

Finally, despite plaintiffs' contention to the contrary, it can be of little moment that their buyer was unsuccessful and was forced to abandon the purchased motel and restaurant business. The fact remains that the buyer did operate the business for over a year during which time the covenant protected the buyer from any competitive activity by the Proulxs.

In sum, the covenant involved in this case was perfectly valid under Florida law. Hence, it is unnecessary to reach the court's further inquiry as to whether, *if the covenant were void,* that fact would be material to a decision by the court in this tax controversy.

Based upon the foregoing considerations, the plaintiffs are not entitled to recover, and their petition should be dismissed.

## CONCLUSION OF LAW

Upon the trial judge's findings and the foregoing opinion, which are adopted by the court, the court concludes as a matter of law that plaintiffs are not entitled to recover, and their petition is dismissed.