RONALD D. TAYLOR, JR. and ROXANNE M. TAYLOR, et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent. Taylor
Docket Nos. 28306-89, 2705-90, 2899-91, 4891-91, 7706-91, 7707-91
United States Tax Court
T.C. Memo 1992-664; 1992 Tax Ct. Memo LEXIS 700; 64 T.C.M. (CCH) 1322; November 16, 1992, Filed *700 For Petitioners in docket Nos. 28306-89, 2705-90, 4891-91, 7706-91, 7707-91: David B. Ferebee. For Petitioners in docket No. 2899-91: Philip G. Cohen and Patrick D. Coleman. For Respondent: Francis C. Mucciolo. PARR
PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Petitioners: Ronald D. Taylor, Jr. and Roxanne M. Taylor Docket No.: 28306-89 Additions to Tax
Year
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)(1)
1981
$ 15,815
$ 3,613
$ 1,237
1982
4,023
982
851
1983
1,313
406
420
1984
541
-
67
1985
99,421
-
4,971
Sec. 6653(a)(1)(A)
1986
107,589
-
5,379
Additions to Tax
Year
Sec. 6653(a)(2)
Sec. 6661
1981
[1]
-
1982
[1]
-
1983
[1]
-
1984
[1]
-
1985
[1]
$ 24,855
Sec. 6653(a)(1)(B)
1986
[1]
26,897
Petitioners: Ronald D. Taylor, Jr. and Shirley A. Taylor Docket No. *701 : 2705-90
Additions to Tax
Year
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)(1)
1983
$ 118,632
-
$ 33,658
1984
89,960
$ 29,415
7,224
1985
259,075
64,819
12,984
Sec. 6653(a)(1)(A)
1986
661,205
-
33,060
Additions to Tax
Year
Sec. 6653(a) (2)
Sec. 6661
1983
[1]
$ 29,658
1984
[1]
22,240
1985
[1]
64,769
Sec. 6653(a)(1)(B)
1986
[1]
165,301
Petitioners: BBJ Products,Inc., Formerly Spectrum Group, Inc. & Subsidiaries Docket No.: 2899-91 Year
Deficiency
1985
$ 194,542
1986
332,972
Petitioners: Kendall B. Taylor and Rose M. Taylor Docket No.:
4891-91
Additions to Tax
Year
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)(1)(A)
Sec. 6653(a)(1)(B)
1986
$ 27,201
$ 6,800
$ 1,360
[1]
*702 Petitioners: David W. Taylor Docket No.: 7706-91 Additions to Tax
Year
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)(1)
1985
$ 83,793
$ 10,866
$ 4,190
Additions to Tax
Year
Sec. 6653(a)(2)
Sec. 6661
1985
[1]
$ 20,876
Petitioners: David W. Taylor Docket No.: 7707-91
Additions to Tax
Year
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)(1)
1982
$ 12,860
-
$ 643
1983
20,041
$ 1,906
1,394
Sec. 6653(a)(1)(A)
1986
87,952
17,795
7,158
Additions To Tax
Year
Sec. 6653(a) (2)
Sec. 6661
1982
[1]
$ 3,001
1983
[1]
3,309
Sec. 6653(a)(1)(B)
1986
[1]
4,479
These cases were consolidated for trial concerning the sole issue that is common to all the cases. *703 The remaining issues in the Taylors' cases were severed and continued. The issue to be decided is whether payments made by the predecessor of BBJ Products, Inc. to the Taylors under a 1985 settlement agreement were payments for a covenant not to compete and consulting fees, and thus deductible in tax years 1985 and 1986 by BBJ Products, Inc. as ordinary and necessary business expenses under section 162[2] and reportable as ordinary income by the Taylors; or whether the payments were for the purchase of the Taylors' stock, and thus nondeductible by BBJ Products, Inc. and reportable as capital gain to the Taylors. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. All of the Taylors resided in Florida at the *704 time they filed their respective petitions. In the mid-1960s, Ronald D. Taylor, Sr. (Mr. Taylor) started Kenco Chemical & Manufacturing Corporation from the kitchen of his home. Taylor developed and patented a pocket bottle, which was used in the pesticide business. By 1979, Kenco Chemical & Manufacturing Corporation and related companies (herein Kenco) employed approximately 100 full-time and part-time employees and realized annual sales of approximately $ 6 million. In April 1980, Mr. Taylor purchased from members of his family all their outstanding shares in Kenco. The stock purchase agreement reads, in pertinent part, as follows: This Agreement is made this 12th day of April, 1980, between Ronald D. Taylor, Sr. and Ronald D., Jr., Kendall Bryce, David Wayne and Shirley Ann Taylor, Stockholders. The stockholders own stock that Ronald D. Taylor, Sr. must acquire for the purpose of selling Kenco Chemical & Manufacturing Co., Inc. Each of the stockholders does hereby relinquish and deliver all right and title to stock held in their names to Ronald D. Taylor, Sr. * * * Should for any reason the company not sell, the stock reverts back to the original owner and this agreement *705 becomes null and void. Subsequently in 1980, Mr. Taylor sold all his stock, which consisted of all the outstanding shares in Kenco and in certain other related companies, including a company that operated a manufacturing plant used in Kenco's business, to Spectrum, Group, Inc. (Spectrum), for a purchase price of $ 8.5 million in cash. [3] Petitioner-BBJ Products, Inc. (herein BBJ, representing the interests of Spectrum, Emerald and BBJ) is the successor corporation of Spectrum. In addition to the $ 8.5 million paid in connection with the 1980 sale, a noncompetition and consulting agreement (herein agreement) was entered into between Kenco and the Taylors, all of whom then worked or had previously worked for Kenco. Kenco would retain the Taylors under the consulting and noncompetition agreement providing for aggregate consulting fees and discretionary (but substantiated) expenses of $ 5.5 million which would be earned and paid at the rate of 2 percent of Kenco's net sales until such time as the full $ 5.5 million was paid. *706 The agreement provided that none of the Taylors would directly or indirectly engage in or undertake any business or activity that in any way competed with the business of Kenco in the United States. The agreement explained that since at least some of the Taylors were knowledgeable regarding Kenco's business and were thus capable of conducting a business that would have been competitive with the pesticide business of Kenco, and enjoyed advantageous business relationships with many of the then existing customers and suppliers of Kenco, the Taylors should be restricted from engaging in the pesticide business. The agreement also provided that Mr. Taylor would perform consulting and advisory services for Kenco during its term. Mr. Taylor was also retained by Kenco to serve as chairman of its board of directors. As compensation for his services and the covenant not to compete, according to the 1980 contract Mr. Taylor and the Taylors were to be paid as follows: (i) Taylor was to be paid a base fee through September 30, 1983, for each day the Agreement was in effect; (ii) Taylor was also to be paid additional compensation if sales of pesticides exceeded prescribed targets; and (iii) *707 each of the Taylors was to be paid a fee based on Kenco's and the Related Companies' "Sales" as that term was defined in the Agreement. The agreement further provided that the Taylors would report the payments received as ordinary income for Federal and any applicable State and local income tax purposes. In their income tax returns for tax years prior to 1985, the Taylors reported the payments they received under the agreement as noninterest ordinary income. After signing the agreement, various disputes arose culminating in litigation and the removal of Mr. Taylor as chairman of Kenco. In order to settle all outstanding disputes, a settlement agreement (herein 1985 settlement) was executed on April 5, 1985. Ken Kirschner, vice president of BBJ, signed the agreement on April 5, 1985; the Taylor family, except Kendall Taylor, signed the agreement on April 6, 1985; and Kendall Taylor, who then resided in Illinois, signed the agreement on April 9, 1985. The 1985 settlement stated that the Taylors assent to terminate the agreement (of 1980), and Kenco agrees to pay the Taylors certain amounts in lieu of the Taylors' rights under the agreement. In connection with the consummation *708 of the 1985 agreement, the Taylors were represented by attorney Ray Greene, Jr. Mr. Greene had cancer and consequently was sick throughout the negotiations. He died in 1987. After the signing on April 6, Mr. Greene contacted Kenco's attorneys expressing the Taylors' wish to make an addition to the 1985 settlement to provide for 25 boxes of insecticide to be given to Mr. Taylor each year for the rest of his life. Mr. Taylor also wished to delay the inspection of certain sprayers which were to be purchased by Kenco pursuant to the terms of the 1985 agreement. Kenco, by letter dated April 8, 1985, then proposed that additional clauses be inserted in the 1985 settlement agreement, namely the obligation of the Taylors to regard the payments received under the 1985 settlement as ordinary income for Federal income tax purposes. Thus, Kenco included in their mailing four pages representing all the proposed changes to be signed by the Taylors. However, on April 11, 1985, Mr. Greene mailed to Kenco the fully executed settlement agreement dated April 5, 1985, with an attached letter stating "Because of the necessity of getting things resigned by Kendall Taylor (who then resided in Illinois), *709 we have decided not to further amend the Settlement Agreement." Thereafter, on April 12, 1985, a letter was hand delivered to Mr. Greene by Foster Shepherd, president of Kenco, asserting that to date no final agreement had been reached as to the terms of the 1985 settlement. The letter further stated that the "offer" (i.e., the April 5, 1985 settlement agreement) was withdrawn by Kenco prior to its execution and delivery by the Taylors. Also by letter dated April 12, 1985, Gayle Petrie, an attorney for Kenco, sent a letter to Mr. Greene, together with replacement pages, for inclusion in the settlement agreement. Thereafter, the 1985 agreement, which included the four replacement pages (herein final agreement), was initialled by all the Taylors, except Kendall Taylor. At the same time, they received payment checks from the settlement. The replacement pages contain a new paragraph 4 which provides that "Each member of the Taylor family agrees to include all payments received under this settlement agreement in his or her ordinary income for federal and applicable state and local income tax purposes." The insertion of this paragraph required squeezing and renumbering subsequent paragraphs. *710 However, the final page, containing the signatures of April 5, 1985 was unchanged. Additionally, an undated consent document which was signed by Kenneth Kirschner (an investor in and a lawyer for Kenco), on behalf of Kenco reads: We refer you to paragraph 4 of the Settlement Agreement, dated the 5th day of April, 1985, among the undersigned, Ronald D. Taylor, Sr. and the other parties thereto. The undersigned hereby consent and agree that the Taylor Family members shall have no further obligations to the undersigned under such paragraph 4 if the payments referred to therein are not deductible by Kenco or Emerald for income tax purposes. Respondent examined Spectrum's income tax returns for the tax years ended November 30, 1985 and November 30, 1986. [4] The revenue agent's report issued to BBJ in connection with the examination states: Payments made to the Taylors prior to April 5, 1985 were all properly reported as ordinary income and Kenco properly deducted the payments as current period costs. It is the position of the Internal Revenue Service that the payments in question are properly deductible as a current period expense, just as claimed on the Spectrum returns for 11/30/85 *711 and 11/30/86. However, since some Taylor family members are claiming the payments are for stock, and are accordingly claiming capital gains treatment, it becomes necessary for the Internal Revenue Service to treat the payments in a like manner in the audit of Spectrum. Otherwise, if the Taylor's position is subsequently upheld in litigation and the corresponding amounts were not disallowed to Spectrum, then the Internal Revenue Service would have allowed an inconsistent treatment of the item and would lose the related tax revenue. OPINION On December 30, 1991, BBJ filed a motion in limine to limit the evidence admitted at trial in this case, specifically to preclude the Taylors from introducing any evidence to explain or vary the written terms of the 1980 agreement and 1985 settlement between the Taylors and Kenco. The Taylors filed a response in opposition on January 7, 1992. Thereafter, respondent *712 filed a memorandum of law opposing the Taylors and supporting the motion in limine filed by BBJ. We heard oral argument on January 13, 1992. BBJ and respondent relied on Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), which was adopted by the Eleventh Circuit in Bradley v. United States, 730 F.2d 718, 720 (11th Cir. 1984), the Court of Appeals to which this case would be appealed. Danielson holds that "a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." Commissioner v. Danielson, supra at 775. By order dated February 7, 1992, we agreed with BBJ and respondent and granted the motion in limine precluding oral evidence as to the intent of the parties which would vary the terms of the agreement. [5] However, we ruled that evidence concerning fraud, mistake, *713 duress, etc., would be received. BBJ contends that the payments were deductible in tax years 1985 and 1986 as ordinary and necessary business expenses under section 162, and that consequently, the payments were reportable as ordinary income to the Taylors as depicted in the agreements between the parties. Respondent, who is a stakeholder in this action, concurs with BBJ. The Taylors argue that the payments are reportable as capital gain and, thus, nondeductible expenses to BBJ. They assert that the final agreement was achieved by fraud, mistake, or duress, and thus invalid. We disagree. As set forth below, having considered all *714 of the Taylors arguments, we nevertheless conclude that in all events the payments are reportable as ordinary income by the Taylors and deductible as a business expense by BBJ. Fraud, Mistake, or Duress
The Taylors claim that their initials were procured on the final agreement by fraud, mistake, or/and misrepresentation. We agreed in our motion in limine to receive evidence concerning these affirmative defenses with regard to the agreements. The burden is on the Taylors to prove that BBJ induced them by fraud, duress, mistake, etc., into signing the final agreement. [6] Under the Eleventh Circuit's decision in Bradley v. United States, supra, a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability. See Danielson v. Commissioner, supra.
*715 The Taylors failed to assert any of these affirmative defenses in their original petition, trial memorandum, or voluminous pretrial motions. It was only after BBJ's Motion in Limine was granted that the Taylors initiated the claim of fraud, mistake, or misrepresentation. On brief (original and reply), the Taylors did not explain which affirmative defense they were asserting: fraud, duress, mistake, or one not herein enumerated. Instead, only as an alternative argument, petitioners submitted that "the settlement agreements as modified with the inserted and initialled pages, were the product of fraud, inequitable conduct and/or mistake." (Emphasis added.) The Taylors contend that they were induced into signing the initialled pages based upon representations of Mr. Kirschner, attorney for and investor in Kenco, that they were merely initialling to show receipt of settlement checks totaling several hundred thousand dollars. They assert that it would be ludicrous to agree to ordinary income treatment in exchange for 25 cases of insecticide. They further assert: the documents themselves reflect manipulation in that the front pages and back pages are unchanged, the spacing was *716 altered in order to avoid renumbering or insertion of additional pages and the testimony was uncontroverted that the documents were delivered to the Taylor family under the auspices of delivering payment checks. In light of the testimony of Shirley Taylor and Mr. Taylor, we find it doubtful that the Taylors were fraudulently induced into initialling the final agreement. On recross examination Shirley Taylor testified as follows: Q. * * * Here is Mr. Kirschner, a person that in litigation you had accused of defrauding you in the execution of a contract. Now Mr. Kirschner is sending a contract over saying, Go ahead and initial it? Are you telling us today that you went ahead and you initialled it without reading it? A. Have you ever met Mr. Kirschner? Q. May I just -- A. He is sugar sweet everywhere. No, I didn't -- I initialled the one without reading it -- yes -- because it looked exactly the same as the one I had read when I signed it; yes. Likewise, on direct examination Mr. Taylor stated, A. And a lady from his office, from Ken Kirschner's office, * * * asked us to initial the pages of the contract that we had previously signed. And therefore we just picked up *717 the contract and looked at the front page, looked at the back page, just like I did a minute ago, and we made sure our signatures were on the contract and so forth. And it looked like everything was there, the same as it had been before. And she said we needed to initial each page of this. * * * Why that we needed to sign each page of this, * * * I was just told by Mr. Kirschner that before I give you these checks, you have to sign all these documents. So I said, Okay. * * * So that is exactly what we did. We did just exactly what he had asked us to do. The Taylors are not as well educated as Mr. Kirschner. In fact, Mr. Taylor suffers from dyslexia and has difficulty reading. However, in spite of this handicap he is an intelligent and highly successful businessman, and a self-made millionaire. He used accountants and was represented by an attorney. Moreover, the Taylors had been engaged in protracted and bitter litigation with Mr. Kirschner over 5 years, and neither liked nor trusted him. These feelings were reciprocated. The Taylors were tired of fighting yet, even after signing the settlement agreement on April 5th, sought to squeeze out an additional concession, a *718 life-time supply of insecticide. This was conveyed to their lawyer in a telephone call apparently as an afterthought rather than a demand. Kirschner apparently was having second thoughts of his own. He, perhaps improperly, seized on this oral request to treat the signed agreement as "rejected," in order to add a paragraph removing any possible ambiguity as to the tax consequences intended. Even so, we conclude that the Taylors were neither induced nor prevented from reading the final agreement prior to initialling it. Even if they initialled the final agreement under the facade of receiving payment checks, they are not relieved of their rudimentary responsibility of "reading before signing." It is well settled, in both Federal and Florida law, that one who signs a contract without reading it must bear the consequences, Northwestern National Ins. Co. v. Donovan, 916 F.2d 372, 378 (7th Cir. 1990); United States v. Stump Home Specialties Manufacturing, Inc., 905 F.2d 1117, 1120 (7th Cir. 1990); Allied Van Lines, Inc. v. Bratton, 351 So. 2d 344, 348 (Fla. 1977); Merrill Lynch, Pierce Fenner and Smith Inc. v. Benton, 467 So.2d 311 (Fla. Dist. Ct. App. 1985); *719 Unless one can show facts and circumstances to demonstrate that he was prevented from reading the contract, or that he was induced by statements of the other party to refrain from reading the contract, it is binding. Allied Van Lines, Inc. v. Bratton, supra at 345. The Taylors did not seek their own lawyer's advice. Even if they made a unilateral mistake through lack of due care in their eagerness to receive their long-awaited money, these circumstances do not rise to the level of duress or fraud, such as would warrant the court's setting aside or reforming the contract. Ordinary Income v. Capital Gains
The Taylors contend that the payments received in settlement of the 1980 contract arose out of litigation stemming from the sale of their stock. As such, they argue the payments are nondeductible capital expenditures to BBJ and capital income to the Taylors. The tax character of a payment in settlement of litigation must be ascertained by reference to the origin and nature of the claim in respect of which the payment is made. Anchor Coupling Co. v. United States, 427 F.2d 429, 432-433 (7th Cir. 1970); *720 Spangler v. Commissioner, 323 F.2d 913, 916 (9th Cir. 1963); Eisler v. Commissioner, 59 T.C. 634 (1973). As authority for their position, the Taylors cite Eisler v. Commissioner, 59 T.C. 634 (1973). In Eisler, the taxpayer sought to claim a current deduction for a $ 235,000 payment made to his former employer in settlement of a lawsuit involving the employer's claim to reacquire certain of its stock. The taxpayer maintained that the entire $ 235,000 was paid in satisfaction of claims related, in one way or another, to his status as an employee; therefore, the entire payment was alleged to be deductible as a business expense. Respondent argued that the payment was capital in nature because it represented the cost of defending or perfecting title to property and should have been added to the original basis. We held that the payments comprised both capital expense, i.e., the amount attributable to the employer's claim to the stock, and business (ordinary) expense, i.e., the amount attributable to the employer's claim for negligent performance. Accordingly, since the release instrument *721 made no apportionment of the payment, we allocated the payments pursuant to our understanding of the bargain intended by the parties on the date of the execution of the release agreement. Eisler is distinguishable from the case before us. Unlike Eisler, the contract to sell Kenco separately stated the amount paid for the stock of the company (which generated capital gain to the Taylors), and the amount to be expended for the covenant not to compete and consulting services (ordinary income to the Taylors). The Taylors contracted in 1980 to sell all the stock in Kenco for $ 8.5 million. In that same agreement, the Taylors entered into a covenant whereby Mr. Taylor would provide consulting services to Kenco and the Taylors, as a family, would refrain from competing with Kenco in the pesticide business within the United States. The covenant had an independent basis for compensation and an ascertainable life apart from the stock; the terms were 2 percent of Kenco's net sales until such time as the full $ 5.5 million shall been paid. It is well established that an amount a purchaser pays for a covenant not to compete in connection with a sale of a business is ordinary income *722 to the covenantor and an amortizable item for the covenantee, provided the covenant has an ascertainable life. Proulx v. United States, 219 Ct. Cl. 363, 594 F.2d 832 (1979); Commissioner v. Gazette Telegraph Co., 209 F.2d 926 (10th Cir. 1954), affg. 19 T.C. 692 (1953); Estate of Beal v. Commissioner, 82 F.2d 268 (2d Cir. 1936), affg. 31 B.T.A. 966 (1934). Likewise, compensation for services, including consulting fees, is includable in gross income. Sec. 61(a). Thus, since both the consulting fees and the noncompetition covenant generate ordinary income, there is no need for an apportionment of the settlement payments as in Eisler. Here it is clear that the payments, in their entirety, were made to the Taylors in settlement of their claims to compensation under the provisions of the agreement relating to consulting services and noncompetition. No part of these payments represented consideration for the purchase of the Taylors' stock. The Validity of Paragraph 4
Paragraph 4 of the final agreement is the focal *723 point of the Taylors' contention. On April 6, 1985, Mr. Taylor proposed that the 1985 agreement (dated April 5) be changed by adding a provision obligating Kenco to provide him 25 boxes of pesticide products a year for his life. Thereafter, on April 8, counsel for Kenco responded stating, Such a change appears to present no difficulty. However, Kenco wishes also to reflect in the final agreement the continuing obligation of each of the Taylors to include payments received under the settlement agreement in their ordinary incomes for federal and any applicable state and local income tax purposes. In a written response on April 11, the Taylors, via counsel, returned the April 5 agreement fully executed stating that they have decided not to further amend the agreement due to problems in obtaining signatures. Immediately thereafter on April 12, Kenco replied by hand-delivered response asserting that the April 5 offer had been withdrawn, and that thus to date no settlement agreement between the parties had been reached. [7]
*724 The Taylor's submission on April 11th of the fully executed contract operated as a valid and timely acceptance of Kenco's offer. Kenco's attempt to withdraw the offer on April 12th was ineffective because the Taylors had already accepted the offer on the previous day. See 1 Restatement, Contracts (2d), section 69 (1981). Thus, the 1985 agreement, without any modifications, was binding. However, later on April 12, a written letter and revised 1985 agreement (i.e., the final agreement), were hand delivered to Mr. Greene, the Taylors' counsel, from Gayle Petrie, counsel for BBJ. The letter outlined the changes in the page numbering to accommodate the additions to the agreement, i.e., paragraph 4 and the clause for the 25 cases of pesticides for Mr. Taylor. In the letter, Mr. Petrie requested that the Taylors initial each page as evidence of their assent to the changes. As mentioned above, all of the Taylors, except Kendall Taylor, initialed each page of the agreement without reading it. Although they protest that they were not aware of the changes inserted into the 1985 agreement by Mr. Petrie, in view of the fact that this Court finds no fraud, mistake, duress, etc., on the *725 part of BBJ, the initialling of the agreement constituted a valid modification of the contract. See U.C.C. sec. 2-209. Thus, having considered all of the Taylors' arguments in regard to the contract, we hold that the final agreement as modified to include paragraph 4 is valid and enforceable against all the Taylors, except Kendall. Kendall Taylor is subjected to the 1985 agreement, i.e., the agreement without modifications. At all events, even if the modification were not valid and thus the contract did not contain Paragraph 4, the Taylors, including Kendall Taylor, would still be required to report the payments received as ordinary income. In fact, under every argument advanced by the Taylors the tax treatment accorded the settlement payments would be the same: ordinary income. As stated previously, the character of a settlement payment is ascertained by reference to the nature of the claim in respect of which the payment is made. See generally Eisler v. Commissioner, 59 T.C. 634 (1973). This doctrine, known as the origin of the claim, was espoused by the Supreme Court in United States v. Gilmore, 372 U.S. 39 (1963). *726 Assuming arguendo, the Danielson rule did not apply; the 1985 agreement and/or the final agreement were achieved by fraud, duress, or mistake, etc.; or the final agreement and paragraph 4 were not valid, the tax effect to the Taylors would remain unchanged, i.e., ordinary income. The Taylors' claim against Kenco had its origin in the 1980 covenant not to compete and the consulting fees, not the sale of stock. (See infra pp.16-17.) All the payments in question arose from that claim and therefore have the same character in the Taylors' hands as would payments for their consulting services or their covenant not to compete, i.e., ordinary income. Thus, all of the Taylors, including Kendall, are responsible for reporting the payments as ordinary income. By the same token, BBJ was correct in deducting those payments as ordinary and necessary business expenses under section 162. Accordingly, as much of respondent's notice of deficiency that applies to this issue in docket Nos. 28306-89, 2705-90, 4891-91, 7706-91, and 7707-91 is sustained. In docket No. 2899-91 pertaining to BBJ and its predecessors, decision is for petitioner-BBJ. To reflect the foregoing, An appropriate *727 order will be issued. Footnotes
1. Cases of the following petitioners are consolidated herewith: Ronald D. Taylor and Shirley A. Taylor, docket No. 2705-90; BBJ Products, Inc., formerly Spectrum Group, Inc. & Subsidiaries, docket No. 2899-91; Kendall B. Taylor and Rose M. Taylor, docket No. 4891-91; David W. Taylor, docket Nos. 7706-91 and 7707-91.↩
1. 50 percent of the interest due on the deficiency.↩
1. 50 percent of the interest due on the deficiency.↩
1. 50 percent of the interest due on the deficiency.↩
1. 50 percent of the interest due on the deficiency.↩
1. 50 percent of the interest due on the deficiency.↩
2. All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
3. Spectrum was the successor to the parent company of Emerald Manufacturing Company, Inc. (Emerald). Four individual investors, with backgrounds in finance and law, formed Emerald to purchase Kenco.↩
4. Spectrum was the parent of an affiliated group, in which Kenco was included, that filed consolidated tax returns.↩
5. This Court has not adopted the Danielson rule. However, where, as here, the case before us is appealable to a Court of Appeals which has adopted the rule, we apply the rule unless we find the terms of the questioned instrument are ambiguous. Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985↩ (10th Cir. 1971).
6. The claim of fraud, mistake, or misrepresentation is between petitioner Taylors and BBJ. It is not predicated on the intent to evade taxes as outlined in Rule 142(b) where the burden would be on respondent.↩
7. It was argued by the parties that there was no "meeting of the minds," and thus no contract. However, at common law and the under the 1 Restatement, Contracts (2d), sec. 62↩ (1981), discussion concerning additional items after an agreement has been reduced to writing does not constitute a rejection of the original offer.